THE STATE ex rel. McCAFFERY et al., v. MASON, Auditor.

### In Banc, March 27, 1900.

1. **Legislative Procedure: PROTEST: PRESUMPTION.** In the absence of protest "noted on the journal" of either house, pointing out in what respect the Constitution has been violated during the passage of the bill, as required by Constitution, article 4, section 37, it will be presumed that the Legislature was not remiss in its duty to make such protest if any grounds therefor existed.

2. **Constitutionality of Statute: REGISTRATION OF VOTERS IN TOWNS OF OVER 100,000 INHABITANTS.** Laws 1899, page 179, relating to registration in cities of 300,000 inhabitants, does not violate Constitution, article 8, section 5, requiring the Legislature to provide for registration in cities having more than 100,000 inhabitants, and that it "may" provide for such registration in cities having a population exceeding 25,000 inhabitants and not exceeding 100,000, "but not otherwise," since there is no limitation as to the number of inhabitants any one city should contain in excess of 100,000; the concluding words of the section, "but not otherwise," simply permitting laws for registration in cities of 25,000 to 100,000 inhabitants.

State ex rel. v. Mason.

3. ———: REGISTRATION FOR CITIES OF 300,000 INHABITANTS NOT WITHIN COUNTIES. Laws 1899, page 179, providing for registration for cities of 300,000 inhabitants, and requiring election commissioners in "cities not within counties" to be paid by the city, thus separating cities not within counties from other cities, is not a special or local law, since the Legislature has the right to require cities not within counties to pay election expenses.

4. ———: ELECTION COMMISSIONERS: VACATING OFFICE. Laws 1899, page 179, section 3, providing for the vacation of the office of election commissioners in cities "now having" 300,000 inhabitants, is not a special law on the ground that no provision is made therein for the vacation of such office in cities which might thereafter attain that size, since the title of the act and the first section thereof show that it applies to cities now having or which may hereafter have that population.

5. ———: REGISTRATION IN CITIES OF 300,000 INHABITANTS: NEW CLASS. Laws 1899, page 179, providing for registration in cities of 300,000 inhabitants, which applies to the city of St. Louis only, does not create a new class of cities within the first class, in violation of Const., art. 9, sec. 7, authorizing the Legislature to divide cities into four classes only, since that section of the Constitution does not apply to the city of St. Louis, which is singled out by the Constitution from the other cities.

6. Legislative Procedure: NON-MANDATORY: DETAILS. Const., art. 4, sec. 25, providing that no law shall be passed except by bill, and that no bill shall be so amended in its passage as to change its original purpose, does not prohibit amendments of mere detail by substituting, omitting, or inserting words in a bill which do not change its purpose.

7. ———: ABSENCE OF PROTEST: PRESUMPTION. In the absence of any protest in either house showing that a bill was amended during its passage so as to change its original purpose in violation of Const., art. 4, sec. 25, prohibiting such amendments, it will be presumed that no such amendment was made.

8. ———: NUMBER OF VOTES: RECITALS IN JOURNAL: JUDICIAL NOTICE OF NUMBER OF MEMBERS. Where the number of legislators voting for and against a bill is entered in the journal, the court will take judicial notice of the number of members in the house, in determining whether it received the requisite constitutional majority.

9. ———: COMPLIANCE WITH MANDATORY PROVISIONS: VALIDITY OF ACT. A statute is valid if the mandatory provisions of the Constitution regulating legislative proceedings have been complied with, though the non-mandatory provisions governing such proceedings have not been observed.

State ex rel. v. Mason.

10. ———: COMPLIANCE WITH NON-MANDATORY PROVISIONS: PRE-SUMPTIONS. It will be presumed that a bill was properly presented and signed, and that the non-mandatory constitutional provisions regulating legislative proceedings have been complied with.

11. ———: LAW: SUFFICIENCY OF TITLE. The title of Laws 1899, p. 179, entitled "An act to provide for the registration of voters in cities of 300,000 inhabitants or more; to provide for the creation of a board of election commissioners and define its duties; to govern elections in such cities, and to prescribe rules governing registrations and elections therein," etc. —is sufficient, since it clearly expresses the subject of the act.

12. Laws Applicable to St. Louis Alone: SPECIAL OR GENERAL. Laws 1899, p. 179, providing for the registration of voters in cities now having or which may "hereafter" have 300,000 inhabitants, which applies only to the city of St. Louis, is not a special or local law within Const., art. 4, sec. 53, prohibiting the enactment of local or special laws, since that city stands alone under the Constitution, and for the further reason that the act makes provision for the future.

13. Elections: REGISTRATION: VALIDITY OF REQUIREMENT: STATE CONSTITUTION. Laws 1899, p. 179, requiring registration of voters in cities of 300,000 inhabitants, and requiring voters to reside 20 days in the election precinct before they can vote, does not violate Const., art. 8, sec. 2, providing that every male citizen of the United States over 21 years of age, who has resided in the State 1 year, and in the city where he shall offer to vote 60 days, shall be entitled to vote.

14. ———: ———: ———: FEDERAL CONSTITUTION. Laws 1899, p. 179, prohibiting non-registered persons from voting, does not violate the fourteenth amendment of the federal Constitution, providing that no State shall deny to any person within its jurisdiction the equal protection of its laws.

SEPARATE OPINION BY GANTT, C. J., AND BRACE AND VALLIANT, JJ.

1. Registration of Voters: CLASSIFICATION OF CITIES. The Constitution commands the Legislature to provide a system of registration of voters in all cities having a population of more than 100,000 inhabitants, and there is no provision in the Constitution requiring it to classify cities for that purpose.

State ex rel. v. Mason.

2. ———: CITIES OF OVER 100,000 INHABITANTS. It is entirely competent for the Legislature to provide one system of registration of voters in cities having one hundred and less than three hundred thousand inhabitants, and other regulations for cities having three hundred thousand inhabitants or over. The Constitution confers this power.

## *Mandamus.*

PEREMPTORY WRIT AWARDED.

*Edward C. Crow*, Attorney-General, *Sam B. Jeffries*, Assistant Attorney-General, and *W. J. Stone* for relators.

(1)   Courts can not go behind the enrolled bill, as authenticated.   Enrollment and authentication are presumption conclusive that the act was regularly passed.   A bill is properly authenticated by being signed by the presiding officers of each house of the legislative department of the State government in open session.   When this is done, and the prerogative of the Governor, in the exercise of his constitutional executive duties, has been satisfied, the bill becomes a law or rule of action prescribed by the supreme power of the State.   It is guaranteed full force and effect and subject alone to such constitutional objections as may appear upon its face, measured by the imperative and necessary application to be given it.   People v. Dunn, 80 Cal. 211; Evans v. Brown, 95 Am. Dec. 717; State ex rel. v. Young, 5 Am. Law Reg. 670; Pac. Railroad v. Governor, 23 Mo. 353; Duncombe v. Prindle, 12 Ia. 1; Eld v. Gorham, 20 Conn. 8; Fouke v. Fleming, 13 Md. 392; People v. Delvin, 33 N. Y. 269; State ex rel. v. Meade, 71 Mo. 266; Field v. Clark, 143 U. S. 649.   Public policy demands that the enrolled bill, properly authenticated, shall be considered conclusive as to its passage in a constitutional and legal manner.   Common law, based upon public policy and sound judgment, has likewise asserted its power in a determined manner in nearly every

State in the Union of States, as has also our federal government through its highest judicial tribunal. Field v. Clark, 143 U. S. 674; Pangborn v. Young, 32 N. Y. 29; Passaic v. Stevenson, 46 N. Y. 173; Underground Co. v. Att.-Gen., 46 N. J. Eq. 270; Sherman v. Story, 89 Am. Dec. 114. (2) The two exhibits "C" and "D," introduced in the evidence by respondent, show conclusively that the enrolled bill was signed by the presiding officers of the respective houses of the General Assembly in open session during the suspension of other business and in full compliance with the mandate of section 37, article 4, of the Constitution. This being shown, it is unnecessary to examine the journals of either house further. State ex rel. v. Mead, 71 Mo. 266; State ex rel. v. Field, 119 Mo. 611; Supervisor v. People, 25 Ill. 181; People v. Dunn, 80 Cal. 211. (3) The house journal shows that bill number 760 was passed on April 20th. The same journal shows that immediately on the passage of the bill the title was amended on the motion of Mr. Barrett. The senate journal of May 20th shows that immediately on the passage of the bill, and after the president had declared the bill passed, "the title of bill, as amended, was read and agreed to." The title of a bill can not be amended until the bill is first agreed to. Rule 86, adopted by the House of Representatives, provides that the rules of parliamentary practice comprised in "Jefferson's Manual and a digest of the rules and practices prepared by Crutchfield and adopted at the second session of the 53d Congress," should govern the House, etc. Aside from the rule referred to , Jefferson is a standard authority on parliamentary law. On amending the title of a bill Jefferson lays down this rule: "After the bill has passed, and not before, the title may be amended." Jefferson's Manual, sec. 42, p. 171; Crutchfield's Digest, 2 Sess. of Congress, p. 563; State v. Saline Co., 51 Mo. 350; State ex rel. v. Field, 119 Mo. 608. (4) Sections 26, 27, 29, 32 and 38 of article 4 of the Constitution are merely directory, and the court should not

even inquire into the truth of the allegations of the return that they were not conformed to, although the inquiry, if made, should disclose compliance, as we hold it would. If this view is correct, then under our objection to the respondent's testimony, an abrupt end is made to all the allegations under consideration, except as to those relating to sections 31 and 37, and possibly section 25. But the record, as we have shown, proves that these sections were not only not violated, but were complied with. In support of the views herein expressed we refer to the following authorities: Pacific Railroad v. Governor, 23 Mo. 353; State ex rel. v. Mead, 71 Mo. 266; State ex rel. v. Field, 119 Mo. 608; Field v. Clark, 143 U. S. 649; Pacific v. Seifert, 79 Mo. 211; St. Louis v. Foster, 52 Mo. 513. (5) The act in question does not contain more than one subject and that is clearly expressed in the title. St. Louis v. Tiefel, 42 Mo. 578; State v. Matthews, 44 Mo. 523; State v. Miller, 45 Mo. 495; Hannibal v. Marion Co., 69 Mo. 571; State ex rel. v. Mead, 71 Mo. 266; State ex rel. v. Ransom, 73 Mo. 79; State v. Bennett, 102 Mo. 357. (6) The act creating board of election commissioners in cities of 300,000 inhabitants and over is not a special law. McAnnich v. Railroad, 20 Ia. 338; State v. Parsons, 40 N. L. 1. Nor does the classification depend on numbers. Wheeling v. Philadelphia, 77 Pa. St. 338.

*Ben Schnurmacher, Geo. D. Reynolds, Noble & Shields* and *Morton Jourdan* for respondent.

(1) In the passage of the "Nesbit Bill" through the two houses of the General Assembly, the provisions of article 4 of the Constitution were violated. (a) Section 25 of the Constitution was violated, in that the bill was "so amended in its passage through" (the House) "as to change its original purpose." Brandon v. State, 16 Ind. 197; State ex rel. v. Ransom, 73 Mo. 88. (b) The journal of the House does not

show a vote by yeas and nays on the adoption of the bill, after the title had been amended; regarding the title as part of the bill, this was a violation of section 31. (2) These constitutional provisions are mandatory. Cooley Const. Lim. (3 Ed.), sec. 76, p. 86; Ibid., sec. 150, p. 165. The Constitution being the fundamental law and restrictive in its powers, is not to be construed like a statute. Varney v. Justice, 86 Ky. 596; Wells v. Railroad, 110 Mo. 286; Cohn v. Kingsley, 49 Pac. Rep. 985; State v. Swan, 51 Pac. Rep. 209; State v. Kiesewetter, 45 Ohio St. 254. (3) The journals, under our Constitution, may be received in evidence, and examined, to determine whether a law had been passed in accordance with the constitutional requirements, and these journals are the best and highest evidence, controlling the enrolled bill itself. Douglas v. The Bank, 1 Mo. 24; State v. McBride, 4 Mo. 305; State ex rel. v. Mead, 71 Mo. 266; State v. Wray, 109 Mo. 594; Wells v. Railroad, 110 Mo. 286; State ex rel. v. Field, 119 Mo. 593. Whether a statute was a constitutional enactment or not is a judicial question to be determined as such. State v. Bailey, 16 Ind. 46; Speer v. Mayor, 85 Ga. 52; Webster v. Hastings, 77 N. W. Rep. 137; People v. Dettenthaller, 77 N. W. Rep. 450; State v. Green, 36 Fla. 154; State v. Hocker, 36 Fla. 358; Cohn v. Kingsley, 49 Pac. Rep. 985; Union Bank of Richmond v. Commissioners, etc., 119 N. C. 214. (6) The law in question in itself is unconstitutional. Const. of Mo., art. 8, sec. 5; Ewing v. Hoblitzelle, 85 Mo. 64; Ex parte Joffee, 46 Mo. App. 360; State ex rel. v. Foster, 119 Mo. 344; Damon v. Broderick, 43 Pac. Rep. 516; Kansas City ex rel. v. Scarritt, 127 Mo. 642. (5) The law is unconstitutional because it expressly contravenes the classification of art. 8, sec. 5, of the Constitution. Sutherland on Stat. Const., sec. 14; Wells v. Supervisors, 102 U. S. 635; Chandler v. Horn, 83 Ala. 390; Ex parte Joffee, 46 Mo. App. 360; Roth v. Gobbert, 123 Mo. 31; Miller v. Wagenhouser, 18 Mo. App. 14; Grumley v.

Webb, 44 Mo. 444; Dart v. Bagley, 110 Mo. 42; Wilcox v. People, 90 Ill. 186; Manley v. State, 7 Md. 135; Lastro v. State, 3 Tex. App. 363.

SHERWOOD, J.—This is an original proceeding in this court, its object being to compel the city auditor to audit a certain bill of expenses incurred by relators as the board of election commissioners in and about the performance of their official duties in their capacity as such commissioners.

The return of the city auditor giving reasons for refusing to audit the bill in question, states in substance that the law under which such election commissioners were appointed and are acting, is constitutionally invalid for that in the course of its passage such proceedings were had as violated the Constitution of this State in several particulars.

The objections thus raised to the constitutional validity of the litigated act will now be discussed. That act is known as House Bill No. 760, and entitled: "An Act to provide for the registration of voters in cities now having or which hereafter may have three hundred thousand inhabitants or more; to provide for the creation of a board of election commissioners, provide for its appointment and define its duties; to govern elections in such cities, defining offenses and providing penalties therefor, and to prescribe rules and regulations governing registration and elections therein, and to repeal all acts and parts of acts in conflict or inconsistent herewith." [Laws 1899, p. 179.]

Section 37 of article 4 of the Constitution declares that: "No bill shall become a law until the same shall have been signed by the presiding officer of each of the two houses in open session; and before such officer shall affix his signature to any bill, he shall suspend all other business, declare that such bill will now be read, and that, if no objections be made, he will sign the same to the end that it may become a law. The bill shall then be read at length, and if no objections be made, he

shall, in presence of the house in open session, and before any other business is entertained, affix his signature, which fact shall be noted on the journal, and the bill immediately sent to the other house.   When it reaches the other house, the presiding officer thereof shall immediately suspend all other business, announce the reception of the bill, and the same proceedings shall thereupon be observed, in every respect, as in the house in which it was first signed.   If in either house any member shall object that any substitution, omission or insertion has occurred, so that the bill proposed to be signed is not the same in substance and form as when considered and passed by the house, or that any particular clause of this article of the Constitution has been violated in its passage, such objection shall be passed upon by the house, and if sustained, the presiding officer shall withhold his signature; but if such objection shall not be sustained, then any five members may embody the same, over their signatures, in a written protest, under oath, against the signing of the bill.   Said protest, when offered in the house, shall be noted upon the journal, and the original shall be annexed to the bill to be considered by the Governor in connection therewith."

Commenting on that portion of the organic law, when it first came under review and within four years after the adoption of the Constitution, this court said:   "We are convinced that the initial clause of the section that 'no bill shall become a law until the same shall have been signed by the presiding officer of each of the two houses in open session,' is mandatory, though it is quite evident that the mandate of the Constitution would be obeyed, so far as concerns proper authentication of the bill, when it receives the signature of the respective presiding officers in open session.   But we do not regard the other clauses of the section under review as mandatory; for it is to be observed that those clauses do not declare that 'no bill shall become a law,' if the presiding officers or the members fail to perform the duties which the residue

of the section imposes, but the only penalty directly expressed is that contained in the initial clause just noted. No inference is, however, to be drawn from this, that the residue of the section is not to be obeyed, for certainly the duties it enjoins are clearly set forth. The framers of the Constitution were evidently of the opinion that they might safely intrust the supervision of the details specified in the remaining clauses of the section to the members of the General Assembly, or else they would have never ordained that any member might by his objection impede the progress of legislation and arrest the signature of the presiding officer to the pending bill on the ground that some unwarranted omission, substitution or insertion had occurred, or that some provision of the Constitution had been violated. Herein lies, in our opinion, the only constitutional corrective for a failure to observe the provisions of the remaining clauses of the section under discussion and to yield a ready obedience to them.

"If it be said that this construction leaves it optional with the Legislature whether they shall comply with the explicit commands of the other clauses of the section, the obvious reply is, that confidence must be reposed somewhere; that the very nature of republican government demands and presupposes it; that if the trust thus reposed is not well founded; that if integrity is not to be found among the legislative representatives of the people, it would be but an easy matter by a simulated observance of constitutional forms in the registry of falsehoods upon the journals, to evade and defeat the most rigid provisions of the organic law that the wit of man is capable to devise.

"As no objection or protest is 'noted upon the journal' of either branch of the General Assembly, the only natural and reasonable conclusion for us to reach is that benign conclusion of the law itself, sanctioned by the wisdom of ages, which presumes in favor of right, and not in favor of wrong. Similar presumptions are daily indulged in respecting judicial

proceedings, and no reason occurs why a similar liberality of inference should not obtain in regard to legislative proceedings in many instances. Viewing the subject in this light, we regard it as unimportant that the journals of the respective houses do not disclose that strict observance of formality which should properly attend the passage of a bill through its various legislative stages, as, for instance, that the presiding officer suspended all other business and declared that such bill would then be read, and that, if no objections were made, he would sign the same, to the end that it might become a law, nor that the bill was immediately sent to the other house. Counsel for respondent fails to observe that section 37, while requiring these things to be done, and these forms to be observed, nowhere requires that they be noted on the journal; the only facts requisite to be noted there, as specified in that section, being that of the signing of the bill and of any protest that may be offered." [State ex rel. v. Mead, 71 Mo. loc. cit. 271, 272.]

Mead's case received the unanimous approval of the members of this court, and was approvingly followed in State ex rel. v. Field, 119 Mo. 593.

Under these rulings it must be held that in the absence of a protest, as already indicated, pointing out in what particulars the Constitution has been violated during the passage of the bill, that it will be presumed the Legislature was not remiss in its duty in that regard, although the journals may have failed affirmatively to record the performance of such duty. This presumption forecloses any investigation as to what occurred during the progress of the bill either as to the occurrence of any substitution, omission or insertion, while on its passage, unless it be the failure to conform to some mandatory requirement of the Constitution like that pointed out in Mead's case, when discussing the initial clause of section 37 *supra*, which fails to make entry on the journal of the recital of obedience to such mandatory requirement. But, it is obvious that these constitutional provisions which were designed to set forth the

formulae incident to the passage of a bill, are wholly separate and apart from considerations which go to the constitutionality of a bill, regardless of the strictest conformity to constitutional requirements which may have marked its course from its embryonic stage down to its final passage and approval.

In this case, however, a protest was entered; it is on the point that the act mentioned is invalid, because it is a local and special law and no notice, etc., was published nor recited in the act, and that therefore, it violates section 54 of article 4 of the Constitution. If the charge thus made in the protest holds, then the law must be deemed invalid.

In support of this theory of the law's invalidity, it is asserted by respondent's counsel that:

"The Nesbit law is a special act, for the reason that it is not uniform in its operation upon a class of cities or communities having 300,000 inhabitants or more; and separates cities not within counties in important particulars from those that are within counties. Thus, it is enacted, sec. 46, Laws 1899, p. 196: 'In all cities not within counties such election commissioners, etc., shall be paid by the city,' etc., etc. The Constitution primarily makes no such distinction, but requires the Legislature to provide for the registration of voters in all cities and counties of more than 100,000 inhabitants. This is the fundamental class.

"The Nesbit act, we think, unconstitutionally provides for registration 'in all cities of this State now having or which hereafter may have three hundred thousand inhabitants or more.'

"When such law has within it provisions that develop the intent to fasten it on a part of a class only, it will be decided illegal and void; and this is done when a particular city of the class 100,000 inhabitants or more, is required to pay a different proportion of liability because of its separation from a county. [State ex rel. v. Herrmann, 75 Mo.

340; State ex rel. v. Jackson Co. Court, 89 Mo. 237; Murane v. St. Louis, 123 Mo. 479.]

"The Nesbit act (section 3) makes provision for the vacation of the offices of election commissioners in cities now having 300,000 population; it makes no provision for the vacation of such offices in cities which shall hereafter reach 300,000 population; in this it does not provide for future conditions, but applies solely to present ones; the exact test, applied to the notary law by this court in the Herrmann case, 75 Mo. 340, on which that law was held unconstitutional, because special. The provision is, 'Said board of election commissioners shall perform all the duties and take the place of the present board of election commissioners of such cities immediately after this act becomes a law. The offices and board of election commissioners as now constituted and existing in such cities to which this act applies are hereby abolished, and the commissions of such election commissioners hereby revoked.' That is, no provision is made to extend the act to cities hereafter acquiring 300,000 population."

And section 5 of article 8 of the Constitution is quoted, which reads as follows: "The General Assembly shall provide by law, for the registration of all voters in cities and counties having a population of more than 100,000 inhabitants, and may provide for such registration in cities having a population exceeding 25,000 inhabitants and not exceeding 100,000, but not otherwise."

Under this provision of the Constitution it was entirely competent to enact the law now under consideration; because by that section of the organic law power is expressly bestowed on the Legislature and they are commanded to "provide by law for the registration of all voters in cities and counties having a population of more than one hundred thousand inhabitants;" and the power being granted, all means necessary to its effectuation went with it as incidents, and

were part and parcel of the principal grant of power. [Ex parte Marmaduke, 91 Mo. loc. cit. 262 and cases cited. To the same effect see,. Sutherland Stat. Construct., sec. 341; 2 Beach Pub. Corp., sec. 1314; State v. Wilson, 87 Tenn. 697; Moulton v. Reid, 54 Ala. 325; Parker v. Way, 15 N. H. 51; 9 Bacon's Ab. 219, 220; People ex rel. v. Eddy, 57 Barb. 593.] With such power conferred, no limitation was laid upon the Legislature as to the number of population which any given city or county should contain in excess of one hundred thousand inhabitants. This language is too plain for discussion. As to the other words of the constitutional section they are simply permissive, and their meaning is that the Legislature are allowed, if they see fit, to enact similar laws respecting cities having a population exceeding 25,000 and not exceeding 100,000. As to the concluding words of the section, "but not otherwise," they simply permit legislation for registration in cities where the population exceeds 25,000 and does not exceed 100,000. And in the very section under review the Constitution separates and distinguishes cities in counties having more than one hundred thousand inhabitants from those cities having a population less than one hundred thousand and more than twenty-five thousand inhabitants.

And the Legislature had the right to require cities, not within counties, to pay for election expenses. If they had not such right, then it would follow that such expenses could not be paid at all, as under the general law such expenses are to be defrayed by the respective counties. Besides, under the statute respecting the construing of laws, it is declared that "whenever the word county" is used, "the same shall be construed to include the city of St. Louis," etc. [Section 6570, R. S. 1889.]

Moreover, in State v. Board of Education, 141 Mo. loc. cit. 50, this court held that, "The Legislature has control over the revenues of the city as over that of the county and State,

and can direct by law that the expenses of elections held in a municipality, for the election of school directors, or for local purposes, shall be paid out of the treasury of the municipality from taxes levied and collected by municipal authorities." To the same effect see State ex rel. v. Field, 119 Mo. loc. cit. 614; State ex rel. v. Owsley, 122 Mo. 68.

It is further urged in opposition to the Nesbit law, that section 3 of that act "makes provision for the vacation of the offices of election commissioners in cities now having 300,000 population; it makes no provision for the vacation of such offices in cities which should hereafter reach 300,000 population; in this it does not provide for future conditions but applies solely to present ones; the exact test, applied to the notary law by this court in the Herrmann case, 75 Mo. 340, on which that law was held unconstitutional, because special." There is this answer to this contention: in the first place section 1 of the statute treats of "cities of this State now having or which hereafter may have three hundred thousand inhabitants or more;" and the title of the act applies only to such cities. In such circumstances the character of the act is stamped upon it by its first section; it was unnecessary therefore to mention or repeat in each or in any succeeding section cities which might thereafter have a population of 300,000 inhabitants or more. The law would imply this, and whatsoever the law will imply is as much part and parcel of a legislative enactment as though in terms inserted therein. [State ex rel. v. Board of Equalization, 108 Mo. 235; State ex rel. v. Walbridge, 119 Mo. loc. cit. 395; Coonce v. Munday, 3 Mo. 374; Han. & St. Jo. R. R. Co. v. Marion Co., 36 Mo. 294; Sutherland Stat. Constr., sec. 334.]

In the second place it is insisted that the Nesbit law violates section 7 of article 9 of the Constitution, by the formation of a new class of cities within the first class, and is therefore in violation of that section of the Constitution just mentioned, which limits the number of such classes to four,

and declares that "the power of each class shall be defined by general laws, so that all municipal corporations of the same class shall possess the same powers and be subject to the same restrictions," and Murnane's case, 123 Mo. 479, is cited as supporting this view, which it undoubtedly does.

Answering this objection on a former occasion it was said in the dissenting opinion in St. Louis v. Dorr, 145 Mo. loc. cit. 499: "The Constitution has made no exceptions to its general grant of power to the Legislature, and the courts without judicial usurpation can make none. But it is urged that if you admit the power of the Legislature by general law to amend the charter of the city of St. Louis, you thereby change the classification of the cities of this State as provided for in section 7 of article 9 of the Constitution. But it is enough to say of such section that it has nothing whatever to do with the city of St. Louis, since that city is by the Constitution singled out and segregated from all other cities in this State, by express mention by name, as well as by peculiar and special provisions, shared by no other city. That section has no more to do with the city of St. Louis, than has section 16 of the same article, which confessedly has no application to that city—and no more has section 17."

But this theory respecting our Constitution fell upon deaf ears, and was not regarded as worthy a moment's consideration. Subsequently, however, Kansas City v. Stegmiller, came up here for adjudication (151 Mo. loc. cit. 204), whereupon it was said: "Again, we think it is plain that the framers of the Constitution *ex vi termini* excluded from its legislative classification the city of St. Louis, which is expressly authorized to adopt its own scheme and charter, and all such cities as it authorized by section 16, article 9, to frame and adopt their own charters. These cities constitute two constitutional classes distinct from those chartered and classified by the Legislature. It follows that the

Legislature may legislate directly for these constitutional cities without infringing the Constitution, and in legislating therefor it does not create a new class, but simply provides for a class created by the Constitution."

With this interpretation of the Constitution the members of this court then present in Banc, agreed; but no mention was made of Murnane's case, nor that it was overruled or in any manner questioned, nor of the fact that the dissenting opinion aforesaid had first advanced the same theory as that finally adopted in Stegmiller's case, *supra.*

Afterwards, Stegmiller's case was followed in State ex rel. Hawes v. Mason (153 Mo. loc. cit. 52), in Banc, where it was said: "So much of the argument indulged in to demonstrate that the act under consideration is a special and not a general law, is inapplicable to legislation of this character. St. Louis is organized directly under the Constitution. It is not in either of the four classes of cities which have been defined by the Legislature under the Constitution. It would have been entirely appropriate for the Legislature to have designated St. Louis by name instead of referring to it as a city of over three hundred thousand inhabitants," and in this opinion all the members of this court then present incontinently concurred; but the case in 123 Mo. 479 was passed *sub silentio,* without as much as a nod of recognition.

Under these rulings, Murnane's case, in so far as concerns the classification idea as applied to the city of St. Louis, must be regarded as no longer authoritative.

Passing now to other sections of article 4 of the Constitution said to have been violated in the passage of the Nesbit law: We look at section 25 which provides that: "No law shall be passed except by bill, and no bill shall be so amended in its passage through either house as to change its original purpose." This purpose means the general purpose of the bill, not the mere details through which and by

which that purpose is manifested and effectuated. Were this otherwise, it is easy to see that the process of legislation would be seriously hampered and embarrassed by every amendment which might be offered, however germane it might be to the idea as formulated in the first draft of the bill. In addition to that, section 25 must be considered in connection with section 37 aforesaid, and inasmuch as no protest was offered based on the prohibition of section 25 in relation to substitution, omission or insertion, which are but other forms of amendment, it must needs follow that in contemplation of law no unwarranted substitution, etc., occurred pending the passage of the bill.

The Nesbit law is also assailed on the ground of violating section 31, of the same article, which declares: "No bill shall become a law, unless on its final passage the vote to be taken by yeas and nays, the names of the members voting for and against the same be entered on the journal, and a majority of the members elected to each house be recorded thereon as voting in its favor." In Mead's case, *supra*, this section was held to be mandatory. Looking into the evidence offered by respondent his exhibit "D," at page 1106, containing the entries of the journal of the House of Representatives of Thursday, April 20, 1899, shows that House bill No. 760, which is the bill in question, was, on motion of Mr. Nesbit, taken up for third reading and passage. The bill was read a third time and then passed by a vote of 75 members, with 53 voting in opposition thereto, 3 members absent, 4 members absent with leave, and 4 members reported sick. We will take judicial notice that the House of Representatives is composed of 140 members; this being the case, it is obvious that House bill No. 760, the name by which the bill was known and identified, received the requisite constitutional majority.

Respondent's exhibit "C," showing the entries of the journal of the Senate, affecting the passage of the bill through the Senate, shows that on Saturday, May 20, 1899, House bill

No. 760 was placed on third reading and passage. The roll was called and the bill passed by 22 members voting in favor thereof and 10 members voting against it. Judicial notice is also taken of the fact that the Senate consists of 34 members, and that consequently the bill carried by the requisite majority.

The exhibits offered in evidence by respondent also show that section 37 was complied with in both houses as to the signing of the bill. The mandatory provisions of section 54 of article 4, having been complied with, it is wholly immaterial under former rulings, so far as concerns the validity of the law, whether House bill 760, went through the precise course prescribed by other sections of that article of the Constitution or not; as those sections are non-mandatory, and among that number is section 38 in regard to the presentation of the bill to the Governor by the clerk, and the failure of the latter to note the fact on the journal. The presumption is in favor of the proper presentation of the bill, and of its timely signature. [State v. Mead, *supra*.] The same presumption holds as to all the other non-mandatory sections pleaded in respondent's return.

As to sufficiency of the title of the act this is affirmed by Mead's Case, *supra*; State v. Blackstone, 115 Mo. 427; St. Louis v. Weitzel, 130 Mo. 600; State ex rel. v. Slover, 134 Mo. 10; State v. Bockstruck, 136 Mo. 335.

Respondent also asserts that House bill 760, violates the following clauses of section 53 of article 4 of the Constitution: Because it is a local or special law; 2, regulating the affairs of counties, cities, etc.; 11, for the opening and conducting of elections, or fixing or changing the places of voting; 14, creating offices or prescribing the powers and duties of officers in counties, cities, townships, election or school districts; 32, forbidding the passage of a local or special law, where a general law can be made applicable and making it a judicial question, etc. All of these objections are answered

by the adjudications in Kansas City v. Stegmiller, and State ex rel. Hawes v. Mason, *supra*, that St. Louis stands alone and that a law designating that city by name would be valid and a general law. [State ex rel. v. Miller, 100 Mo. 439.]

The law is general for the further reason that it makes provision for the future; not only for cities now having a population of 300,000 or more, but for such cities which in the future may attain a like population.

Further objections are made to the law on the ground that it is in opposition to section 2, 5, 8, 10 and 12 of article 8, of the Constitution as follows:

"Section 2.  Every male citizen of the United States, and every male person of foreign birth, who may have declared his intention to become a citizen of the United States according to law, not less than one year nor more than five years before he offers to vote, who is over the age of twenty-one years, possessing the following qualifications, shall be entitled to vote at all elections by the people:  First,  He shall have resided in the State one year immediately preceding the election at which he offers to vote.  Second,  He shall have resided in the county, city or town where he shall offer to vote, at least 60 days immediately preceding the election."

"Section 5.  The General Assembly shall provide, by law, for the registration of all voters in cities and counties having a population of more than 100,000 inhabitants, and may provide for such registration in cities having a population exceeding 25,000 inhabitants, and not exceeding 100,000, but not otherwise."

"Section 8.  No person while kept at any poor house or other asylum, at public expense, nor while confined in any public prison, shall be entitled to vote at any election under the laws of this State."

"Section 10.  The General Assembly may enact laws excluding from the right of voting all persons convicted of

felony or other infamous crime, or misdemeanors connected with the exercise of the right of suffrage."

"Section 12. No person shall be elected or appointed to any office in this State, civil or military, who is not a citizen of the United States, and who shall not have resided in this State one year next preceding his election or appointment."

Section 5 of that article has already received sufficient discussion showing its mandatory nature; that it confers full power on the legislature to require the municipality to pay the cost of elections held therein, and that such legislation is not special, but general in its nature, and not at war with the classification theory. And it may be further said that the act under review does not at all militate against the constitutional right of any citizen, otherwise eligible, to vote. Registration laws grow more in favor as the years go by, as tending to prevent fraud and thereby preserve the purity of the ballot box. On this topic Judge COOLEY observes: "The provision for a registry deprives no one of his right, but is only a reasonable regulation under which the right may be exercised. Such regulations must always have been within the power of the legislature, unless forbidden. Many resting upon the same principle are always prescribed, and have never been supposed to be open to objection. Although the Constitution provides that all male citizens twenty-one years of age and upwards shall be entitled to vote, it would not be seriously contended that a statute which should require all such citizens to go to the established place for holding the polls, and there deposit their ballots, and not elsewhere, was a violation of the Constitution, because prescribing an additional qualification, namely, the presence of the elector at the polls. All such reasonable regulations of the constitutional right which seems to the legislature important to the preservation of order in elections, to guard against fraud, undue influence, and oppression, and to preserve the purity of the ballot box, are not only within the constitutional power of the

legislature, but are commendable, and at least some of them absolutely essential." [Const. Lim. (6 Ed.), pp. 757-8.]

Of the law in question it is said by respondent that it "deprives the citizens of the United States residing in the city of St. Louis of their right to the equal protection of the laws, and imposes on citizens of said city unconstitutional requirements as preliminary to their right to vote and hold office and is null and void." This assertion is amply answered by the quotation already made from an eminent author and jurist, and it may be further answered in this way: Section 11 of the controverted act, in so far as it prescribes the preliminary qualifications as to residence in order to entitle a citizen to vote, is the following:

"Sec. 11. Every male citizen of the United States, and every [male] person of foreign birth who may have declared his intention to become a citizen of the United States according to law, not less than one year nor more than five years before he offers to vote, who is over the age of twenty-one years, who has resided in the State one year next preceding the election at which he offers to vote, and during the last sixty days of the time shall have resided in the city where such election is held and during the last twenty days of that time in the precinct at which he offers to vote......shall be entitled to vote at such election, for all officers, state or municipal, made elective by the people, or at other elections held in pursuance of the laws of the State, but shall not vote elsewhere than in the precinct where his name is registered, and whereof he is registered as a resident."

This section is just the same as section 20 of what is known as the *"Filley Act"* approved May 31, 1895 (Laws 1895, extra session, p. 5); and with the exception of the bracketed word in section 11 the law was the same in 1889. [Revised Statutes 1889, sec. 988.]

The law of Ohio is substantially the same on this point as our own statute, as to *unmarried* men, except that it re-

quires a voter to have been resident of the *county* for 30 days and resident of the township, village or ward of a city or village for 20 days next preceding the election. As to a voter who is the head of a family, greater privileges are accorded; *bona fide* removals from one ward of the city to another ward, or to another township or village in the same county, and vice versa are permitted. [1 Bates' Annotated Stats.Ohio, sec. 2945.]

In Kentucky, the statute is in the language of the Constitution of that State, and requires a residence in the State for one year, in the county six months and in the precinct 60 days. [Kentucky Stats. 1894, sec. 1439.]

In Illinois, the language of the statute following that of the State Constitution, requires a residence in the State for one year, in the county 90 days, and in the election district 30 days. [2 Starr. & Curt. Annot. Stats. Ill., p. 1652, sec. 66.]

In Massachusetts, the constitutional and statutory requisites as to the time of residence prior to voting, are one year in the State, and six months in the town or district, thus differing from similar regulations in Kentucky, only in the fact that in the latter 60 days residence is required in the precinct, so that it will be noted that the preliminary requirements as to the right to vote in this State are not more stringent, at least as to single men who offer to vote, than those in the State of Ohio.

But whether they were or not does not signify , since, as remarked by an author on the subject under discussion, "The power to provide for the orderly exercise of the right of suffrage, which we have seen belongs to the State Legislature, includes the power to enact registry laws, and to prohibit from voting persons not registered. It is now generally admitted that these laws do not add to the constitutional qualifications of voters, and are therefore not invalid." [McCrary on Elections (4 Ed.), sec. 127.]

In Illinois, where the act required registration to be com-

State ex rel. v. Mason.

plete by the third Tuesday before the election, it was held constitutional; the court remarking: "If it be admitted, that the Legislature can require a voter to establish his qualifications before election, it is difficult to see why, upon principle, or as a question of power, it can not require such proof to be made, as well three weeks before the day of voting, as ten days, or five days, or even one day prior thereto. The real question, involved in the objection, is, whether any man can be prevented from voting who proves, or offers to prove, on the day on which he seeks to cast his ballot, that he is a legal voter. If cases can be supposed, where the 'three weeks' requirement will deprive qualified electors of the privilege of depositing their votes, cases can also be supposed, where one day's requirement will work the same result. This mode of reasoning carried out to its logical sequence, will make any kind of a registry law unconstitutional. For it would be a physical impossibility for the judges of election to receive the votes and make up the registry at the same time and on the same day." [People ex rel. v. Hoffman, 116 Ill. loc. cit. 614.]

The Constitution of that State requires that "all elections shall be free and equal," and yet in that case it was ruled that this declaration "does not necessarily mean that there must be uniformity of regulation in regard thereto in all portions of the State. Certain regulations may be prescribed for the conduct of elections in cities and villages, though they may have no application to the country places."

It will be found upon examination that the great current of authority flows in the direction of holding it entirely competent for the Legislature to regulate registration and the conduct of elections in the manner above indicated; the origin of these rulings being Capen v. Foster, 12 Pick. 485. See, also, State v. Butts, 31 Kan. 537; Weil v. Calhoun, 25 Fed. Rep. 865; In re Polling Lists, 13 R. I. 720; Patterson v. Barlow, 60 Pa. St. 54; Myers v. Moffet, 2 Bartlett's Elec. Cas.

And in relation to voters in St. Louis being denied "the equal protection of the laws" by the controverted statute; this charge may be answered and refuted by the language of Mr. Justice BRADLEY in Missouri v. Lewis, 101 U. S. loc. cit. 31: "We might go still further, and say, with undoubted truth, that there is nothing in the Constitution to prevent any State from adopting any system of laws or judicature it sees fit for all or any part of its territory. If the State of New York, for example, should see fit to adopt the civil law and its method of procedure for New York City and the surrounding counties, and the common law and its method of procedure for the rest of the State, there is nothing in the Constitution of the United States to prevent its doing so. This would not, of itself, within the meaning of the Fourteenth Amendment, be a denial to any person of the equal protection of the laws. If every person residing or being in either portion of the State should be accorded the equal protection of the laws prevailing there, he could not justly complain of a violation of the clause referred to. For, as before said, it has respect to persons and classes of persons. It means that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances."

In concluding this portion of the opinion it may be well enough to say that in their general features most of the election laws of our neighboring States as well as of our own, appear to be in their general features and design the same, to wit: that of preventing fraud and of making it more difficult to defeat the will of the people as recorded, or as intended to be recorded at the polls.

In Ohio, for instance, the Secretary of State is *ex officio* "State Supervisor of Elections," and he appoints four deputy supervisors in each county in the State of different political parties and they, in counties where no registration is done, appoint judges and clerks of each political party for service at

elections. In cities of the first and second classes a board of elections is appointed by the mayor and they shall be equally of the leading political parties, and they appoint registrars, judges and clerks of each of the two leading political parties, to attend at elections in such cities.

In Illinois, the "Board of Election Commissioners" is appointed by the county court. They serve in every city, village and incorporated town. Such commissioners must be three in number; two of them of the leading political parties. Such commissioners select three electors who are to act as election judges for each precinct, and the two leading political parties are to have one judge each, and one of the clerks, and these numbers vary as to judges and clerks as to the leading political party represented by a minority of all the commissioners. The board of election commissioners appoint a chief clerk, and have other clerical assistants.

In this State under the act in question, the Governor appoints a "Board of Election Commissioners" three in number; this is done by and with the advice and consent of the Senate. One of these commissioners is required to be of the opposite political party to which the Governor belongs. Such commissioners are required to give bond with security in the sum of $10,000 for the faithful performance of their duties. These commissioners appoint and commission one deputy election commissioner who is to be the secretary of the board, and he may employ other clerical assistants if necessary. These commissioners select and choose four electors as judges of election for each precinct, and two clerks, and "two of said judges and one of said clerks of election shall belong to and be members of the party of opposite politics to the other two judges and clerks."

In Kentucky, under what is commonly called the "*Goebel Law*," the General Assembly elects "The State Board of Election Commissioners." This board appoints a secretary, and for each county in the commonwealth, a board

styled the "County Board of Election Commissioners." This county board appoints for each election precinct, "two judges, one clerk and one sheriff of election," and they "shall be so selected and appointed as that one of the judges at each place of voting shall be of one political party, and the other of a different party; and there shall be the like difference at each voting place between the sheriff and clerk of election." This summary of the election laws of three States, besides our own, does not disclose any, very marked differences between these laws in general outline and operation. If honestly and faithfully administered, the result will be in accordance with such proper administration. If otherwise administered, the result will be such as might attend the operation of the most carefully drafted law. But certainly it would seem with an even division of the judges and clerks in political opinion at each election precinct, that a considerable safeguard is thrown around the purity of the ballots at the polls, and the prevention of fraudulent returns being made.

Respondent further contends that inasmuch as the Nesbit law professedly repeals the act entitled "An Act to create a board of election commissioners," approved May 31, 1895, and this act is approved June 19, 1899, and what is known as the Cardwell act (Laws 1899, p. 197), in relation to cities having over one hundred thousand inhabitants, which purports to amend said act of 1895, and was approved also on June 19, 1899, that therefore the repeal of the act aforesaid was not accomplished. In reference to this, it is enough to say that the Cardwell act is not before us for adjudication; that so far as concerns the Nesbit act, it *does* repeal the act of 1895. Whether it be possible to amend an act, and make it a valid law taking effect on the day its repeal is accomplished by another act, is not involved in the issues now before us, and any utterance we might make on the subject would be wholly *obiter*; we shall therefore decline to consider or rule the point.

Finally, section 46 of the Nesbit law, as already stated, gives full authority (even if it would not be granted by necessary and inevitable implication as aforesaid), to compel the city to pay the expenses incurred by the election commissioners, and ordinance 19,835, known as "relator's exhibit 2," shows the sum of $75,849.25 was appropriated by the municipal assembly for "election and registration" purposes. This being the case, section 46, *supra*, takes hold of the appropriation thus made and will disburse it as occasion may require.

The premises considered, we award the peremptory writ.

All concur, *Burgess* and *Marshall, JJ.*, *in toto*; *Gantt, C. J.*, and *Brace* and *Valliant, JJ.*, in all except the remarks about the *Murnane case. Robinson, J.*, absent.

SEPARATE OPINION OF GANTT, C. J., AND BRACE AND VALLIANT, JJ.

We concur in the opinion save and except so much thereof as declares Murnane v. St. Louis, 123 Mo. 479, overruled.

In our opinion the Constitution commands the General Assembly to provide a system of registration of voters in all cities having a population of more than one hundred thousand inhabitants, and there is no provision of the organic law requiring the General Assembly to classify cities for that purpose, as there is in providing charters for the various classes of cities, and hence we respectfully submit that the discussion of section 7 of article 9 of the Constitution in this case is not relevant.

We have no doubt whatever that it is entirely competent for the legislature in its wisdom, by general laws, to provide one system for cities having over one hundred thousand inhabitants and less than three hundred thousand, and other regulations for cities having three hundred thousand inhabitants and over.

The people by the Constitution conferred the legislative power upon the General Assembly, subject to the limitations

VOL. 155 mo—33

therein contained, and there is no such limitation as that claimed by respondent.

The classification theory has nothing to do with the case, and the act in this respect violates no article of the Constitution.

The power to regulate elections is a governmental function and the city of St. Louis is just as much subject to the laws of the State in this regard as any other county or city of the State. The Murnane case involved a change of the charter of the city of St. Louis in respect to a municipal function. The discussion of that case in our opinion is therefore *obiter*.

With this exception we fully agree in the very able opinion of our learned brother.