STATE OF MISSOURI, at the Relation and to the Use of RAYMOND C. BEHRENS, Relator, v. RUFUS CRISMON, E. H. STARK, and WALTER GRADY, Judges of the County Court of Miller County, Missouri.— No. 39326.—188 S. W. (2d) 937.

Court en Banc, July 16, 1945.

*Scott Peters* and *Paul E. Allen* for relator.

*Robert M. Fendorf,* Prosecuting Attorney of Miller County, for respondents.

176

 LEEDY, J. Relator and other resident taxpayers of certain territory in Miller County desired to organize the same into a special road district aggreeably to the provisions Art. 10, Chap. 46, R. S. '39.[1] To that end, and as one of the requisite steps under the statutory scheme for establishing such districts [Sec. 8704], they filed a petition in the county court of said county, of which the respondents were and are the judges, asking the court to submit to a vote of the people of such proposed special road district the question of the adoption of Art. 10, supra. The respondent judges denied said petition. Whereupon relator, alleging said action to have been arbitrary and capricious, applied to this court for mandamus to compel the submission of said question. Our alternative writ issued, and respondents made return. On the coming in of the return, relator filed a motion for judgment on the pleadings which had the effect of admitting all facts well pleaded in the return. State ex rel. Russell v. State Highway Commission, 328 Mo. 942, 42 S. W. 2d 196. The facts not being in dispute, the issues presented are questions of law.

The questions raised, or sought to be raised, by respondents are two: (1) That the village of Bagnell is not a town or village within the meaning of Sec. 8673,[2] et seq., and hence want of compliance with one of the conditions prescribed by said statutes for the organization of such districts; and (2) Inequitable and unjust consequences would result from the formation of such proposed district, for which reasons, and both of them, it is alleged, the petition in the county court was denied.

The proposed road district consists of territory in Miller County not exceeding eight miles square, wherein is located Bagnell, a village containing less than one hundred thousand inhabitants. Said county is not under township organization, nor does it contain fifty thousand inhabitants, or more, and lie adjoining a city of three hundred thousand inhabitants. Thus it appears that all the requirements of the statutes, supra, have been met, unless there is validity in the first of respondents' foregoing claims.

For present purposes it will be assumed, as contended by respondents, that the term "village," as used in Sec. 8673, means an incor-

---

[1] All references to statutes are to R. S. '39, and to the same section numbers in Mo. R. S. A.

■ [2] Providing for the organization into a special road district of "territory not exceeding eight miles square, wherein is located any city, town or village containing less than one hundred thousand inhabitants," and containing a proviso that said section "shall not apply to counties under township organization," nor to counties of "fifty thousand inhabitants or more and lying adjoining any city of this state containing three hundred thousand inhabitants or more." [Sec. 8673.]

porated village.[3] Passing, then, to a consideration of the facts, upon which it is asserted that the village of Bagnell is no longer "a town in fact or reality," but exists "merely on paper," we find the return makes the following allegations: That respondents admit that "Bagnell is a village of said county," although they deny it "is an incorporated town or village within the meaning and intent of" the statutes, supra; that the townsite of Bagnell was laid out and platted in 1883-1885 by William Bagnell; that it was not incorporated at that time, but for years thereafter was a ferry crossing, a trade center, and an important point for the shipment of railroad ties.

The return further avers: "*In 1926 the town was incorporated by the county court of Miller County.* During the construction of the Bagnell Dam, three disastrous fires wiped out most of the buildings in the town proper, and in May, 1943, a record flood of the Osage River destroyed other buildings. The Missouri Pacific Railroad continues to maintain a depot for one train on a three-day-per-week schedule, but other than the depot there is not a store of any description or any other business establishment whatsoever in the whole incorporated area. The river ferry operated for so many years at Bagnell went out of business because a state highway passes across the Bagnell Dam only a few miles away. The United States Postoffice at Bagnell was also discontinued several years ago. Most of the former inhabitants have moved away. The corporate boundaries of 1926 included 330 acres of land, and included all the land embraced within one entire common school district (District 48), the William Bagnell platted townsite being only a small part of the area included within the corporate limits. Most of the land at the time of the incorporation was and since has been used for agricultural purposes, a good part of which is rough and hilly and used only for pasture. Few of the streets laid out by William Bagnell were ever opened up for public travel, and most of the lots, blocks and streets platted out by him have long since been obliterated as such and now lie in fields and pastures without having any semblance of ever having been townsite property. *In one section* of the William Bagnell townsite up a hollow or ravine, commonly known as the "old town" or "Pennytown," *is a group of*

[3]It is unnecessary to decide the question, but the contention would seem to be supported by the following provisions of other sections of Art. 10: Sec. 8675 providing that the "mayor and members of the city council of *any city or town* within any special road district thus organized, together with the members of the county court" shall, in the first instance, appoint the governing body of the district, a board of commissioners, and annually thereafter appoint one member thereof; Sec. 8683 authorizing the spending of not more than one-fourth of the district's revenue on the "roads and streets within the corporate limits of *any city* within said special road district; Sec. 8690 providing for the disposition of proceeds from "pool or billiard table licenses collected by *any city* within any such special road district," and Sec. 8699 requiring a copy of the board's annual settlement with the county court to be filed with the *"city clerk."*

*about six scattered houses now occupied. About half a dozen more scattered residences are occupied half a mile away* in the vicinity of the railroad depot near the Osage River and in what used to be the main part of the village. Farm and pasture land lies between and all around the two groups of houses. No trustees for the town were elected, no town taxes were levied and no municipal functions were carried on during the eleven years from 1933 to 1943, inclusive. *But in the spring of 1944,* in an attempt to revive and qualify Bagnell as a town for the formation of the proposed road district *a board of trustees was elected from the few adult inhabitants of the incorporated area."* (Italics ours.) Furthermore, it is admitted in respondents' brief that the corporation "has never been formerly dissolved by an order of the county court."

We think respondents' contentions overlook certain fundamental principles of the law relating to the municipal corporations. "The power to create or establish municipal corporations, or to enlarge or diminish their area, to reorganize their governments, or to dissolve or abolish them altogether is a political function which rests solely in the legislative branch of the government, and in the absence of constitutional restrictions, the power is practically unlimited." 37 Am. Jur., Municipal Corporations sec. 7, p. 626. In that connection this court has said: "It has long been the rule in this state, and generally throughout the country, that the power of the legislature in the creation of public corporations . . . is absolute except where limited by the constitution. The legislature may also change, divide, consolidate and abolish them as the public welfare demands." State ex. rel. Consolidated School District No. 8 of Pemiscot County et al., v. Smith, State Auditor, 343 Mo. 288, 121 S. W. 2d 160, and cases therein cited.

"The officers do not constitute a corporation, nor does the council even constitute a corporation. The inhabitants of the designated locality, are the corporators. The officers are the mere servants or agents of the corporation." Welch v. Ste. Genevieve, 1 Dill. (U. S.) 130. Such is the effect of Sec. 7242 resulting from the express provision that the "inhabitants of any town or village . . . may be incorporated under a police established for their local government." And said section further provides that "they and their successors . . . shall have perpetual succession, *unless disincorporated* . . . ." Secs. 7295-7296 declare the reasons, and prescribe the procedure for, disincorporating.

In 1 Dillon's Municipal Corporations, 5th Ed., sec. 338, p. 591 it is said: "The doctrine of a *forfeiture of the right to be a corporation* has also, it is believed by the author, no just or proper application to our *municipal* corporations. . . . In short, unless otherwise specially provided by the legislature, the nature and constitution of our municipal corporations, as well as the purposes they are created to subserve,

are such that they can, in the author's judgment, only be dissolved by the legislature, or pursuant to legislative enactment. They may become inert or dormant, or their functions may be suspended, for want of officers or of inhabitants; but *dissolved*, when created by an act of the legislature, and once in existence, they cannot be, by reason of any default or abuse of the powers conferred, either on the part of the officers or inhabitants of the incorporated place. As they can exist only by legislative sanction, so they cannot be dissolved or cease to exist except by legislative consent or pursuant to legislative provision.''

To the same effect is 1 McQuillin's Municipal Corporations, 2d Ed., sec. 317, pp. 380-381: ''A municipal corporation can only be dissolved in the manner prescribed by law . . . Thus a municipal corporation is not ipso facto dissolved or destroyed by a non-user of its powers, in whole or in part, or failure of a term of years to exercise the functions of a municipality, since a judicial sentence or legislative act is necessary to effect a dissolution. In such case the municipal corporation would be suspended for the time, but not civilly dead, since its dormant functions could be revived without action on the part of the sovereignty, the sources from which, in theory of law, corporate life originally came. The result would be the same should all of the inhabitants remove without the corporate limits. The remedy for failure to exercise municipal powers or for illegal acts or misconduct of the officers or agents of the corporation is not dissolution or forfeiture of the charter.''

The same author says in Sec. 318: ''A municipal corporation is not dissolved by the mere failure to elect or appoint officers and agents to conduct its government, for its continuance as a legal entity does not depend on the existence of officers.''

We are not advised as to the number of inhabitants of the village, but it does appear that there are at least a dozen ''scattered houses now occupied,'' and that the village now has an elected board of trustees, so that notwithstanding the cessation of corporate functions for a period of about eleven years, the same no longer remain dormant, but have been revived. This sufficiently demonstrates the inapplicability of the case principally relied on by respondents, holding that, ''If the corporation (an incorporated village) has ceased to function for so long, and the conditions have become such that there is no reasonable ground to believe that its functions will ever again be resumed, then it ceases to be a corporation de facto . . .'' Holdaway v. St. Louis-San Francisco Ry. Co., (Mo. App.) 269 S. W. 641, a case involving the statutory duty of a railroad to fence its right-of-way. From what has been said, it follows that Bagnell must be treated as a village or town for the purpose of the special road district statutes in question.

The other defense is based on these facts: That there were formerly eight special road districts in Miller County, including the

former Bagnell special road district which was organized under what is now Art. 11, Chap. 46; that the operation of said districts was unsatisfactory, and, as a result of a movement for their dissolution initiated by said former Bagnell district, and induced by it, all of said eight districts were dissolved, and the road machinery, equipment and funds on hand were, respectively, by them turned over to the county; that since 1942 all of the territory formerly embraced within said eight special road districts has been operated as a single unit, under the direct control of the county court; that by pooling the road revenue under this plan, the county was enabled to, and did purchase appropriate and expensive road machinery; that by reason of the foregoing, the formation of the proposed district is contrary and inimical to the interests of the public; that the people of the districts dissolved would be injuriously affected, and such formation would be especially inequitable and unjust to all the inhabitants and property owners in the aforesaid disorganized districts who had changed their position in order to bring about a unified control and pooling of resources under the direct jurisdiction of the county court. The return in this connection further sets up the unique state of affairs resulting from the construction in 1929-31 of Bagnell Dam, and the enormously expanded values growing out of the construction thereof. For example, the assessed valuation of a certain 671 acres of land (presumably that whereon the dam and hydro-electric works were constructed) was assessed $3,989,870.00 for 1944 taxes, whereas the same land assessed as farm land in 1925 was valued at $14,230.00. The road tax on the same land for 1944 was $9,974.68; for 1925 it was $58.47. One-half of this increased revenue would go into the proposed district.

As we have already pointed out, the creation of public corporations such as the proposed district is exclusively a legislative function. And the legislature, in the exercise of that function, having by general law prescribed the conditions under which such districts may be organized, it follows that the authority of the county court is limited to ascertaining whether the statutory requirements have been met; but it has no discretion to determine whether the corporation should be created, and so pass on the question of public policy involved therein, as was attempted in the case at bar. Accordingly the second defense set up must be held unavailing.

For the foregoing reasons, the alternative writ should be made peremptory. It is so ordered. All concur except *Gantt, J.*, absent.