STATE OF MISSOURI, on the Information of J. E. TAYLOR, Attorney General, at the Relation of KANSAS CITY, MISSOURI, Relator, v. CITY OF NORTH KANSAS CITY, Respondent, LYLE H. BEAN, JR., ALBERT B. FUSON, ROY L. SIMPSON, EDGAR WRIGHT, VIRGIL WOODS, LLOYD I. BEVEAL, NELSON DICK, WILBURN DEAN, ERNEST MOSBY, JAMES DAVIDSON and W. C. DAVIDSON, Intervenors, No. 40216 — 228 S. W. (2d) 762.

Court en Banc, February 25, 1950.

Rehearing Denied, April 10, 1950.

*David M. Proctor,* City Counselor, *Forest W. Hanna* and *John J. Cosgrove,* Assistant City Counselors, for relator.

378

*Ward A. Dorsey, James P. Aylward, George V. Aylward* and *Terence M. O'Brien* for respondent.

382

*Wherritt & Sevier, Alan F. Wherritt* and *Robert F. Sevier* for intervenors.

384

 CONKLING, J.—This original proceeding in the nature of quo warranto was instituted by the Attorney General at the relation of the City of Kansas City, against the City of North Kansas City. It grows out of an attempt by each of those cities to annex a substantially identical area in Clay County, Missouri, and involves the priority and legality of the annexation proceedings. Relator (Kansas City, Missouri), a city existing under a constitutional charter adopted by it on February 24, 1925, is the second city in size in Missouri and is located in the northwestern corner of Jackson County. Respondent (North Kansas City, Missouri), a city of the fourth class, is north of, across the Missouri River from relator, and in Clay County. Intervenors (claiming to represent all persons similarly situated) are residents and taxpayers residing within the areas proposed to be annexed.

After the filing of the information, we issued our writ and rule to show cause. Respondent filed its answer and return raising both questions of law and issues of fact. We appointed Honorable Randall R. Kitt, of the Livingstone County Bar, as Special Commissioner to hear the evidence and to report his findings of fact and conclusions of law. Intervenors were permitted to file their petition. Our Commissioner heard more than 3800 pages of testimony offered by the parties, considered the numerous exhibits and the briefs, and has filed his report here. His conclusions of law are that relator's annexation proceedings are valid and that respondent has no municipal jurisdiction over any of the area described in relator's annexation proceedings. After his report was filed all the parties filed briefs here and we heard extended oral argument.

By the prayer of the information in quo warranto relator asks that respondent be ousted and declared barred from any municipal jurisdiction over any territory included within relator's proposed annexation area, because relator, through priority of time, obtained jurisdiction to continue its proceedings (initiated August 19, 1946) to a conclusion. Realtor asks us to declare it has exclusive municipal jurisdiction over the area described in its annexation proceedings. In the separate answer of respondent and in the petition of intervention both the respondent and intervenors contend relator's proceedings to annex the area proposed are illegal, unreasonable and void in law. They ask that we adjudge that respondent has exclusive

municipal jurisdiction in the area described in respondent's annexation proceedings.

On August 19, 1946, a proposal designated Ordinance 10349 was introduced into relator's City · Council. It provided for the submission to the electors of relator at the next general election (Nov. 5, 1946) of a proposal to amend relator's charter to extend its corporate limits northward into Clay County to include approximately 17 square miles described therein. The first reading thereof was made in the relator's City Council on August 19, 1946. On August 20, 1946, a proposal designated Ordinance 1193 was introduced in the respondent's Board of Aldermen. Respondent's proposed ordinance provided for the submission to respondent's electors, at a special election on September 10, 1946, of a proposal to extend respondent's boundaries north and northwest to include about eight contiguous square miles (described therein) which (except a few hundred acres) was within the area proposed to be annexed by relator in its proposal to amend its charter as set out in its proposed Ordinance 10349. Ordinance 1193 was passed by respondent's Board of Aldermen on August 20, 1946 and approved by its mayor on August 27, 1946.

. On September 3, 1946, a Committee Substitute for relator's proposed Ordinance 10349 (re-describing the territory proposed to be annexed by excluding therefrom the towns of Avondale and Randolph) was presented to relator's Council and on that date was passed as an emergency measure and approved by its mayor. On September 10, 1946, at respondent's special election, Ordinance 1193 was approved by its voters. At the general election of November 5, 1946, relator's proposed charter amendment was submitted to its voters and was approved by a majority (but not by three-fifths) of those voting upon that proposition.

By relator's proposed Ordinance 10349, introduced in its City Council on August 19, 1946, it was provided that at the election of November 5, 1946, its electors should vote upon a proposal to amend its charter by repealing and re-adopting Sec. 4 of Article I of its charter, so that, as re-adopted, Sec. 4 would provide that relator's corporate limits include also the new area proposed to be annexed in Clay County. At the August 19, 1946 session of relator's Council, by motion, Rule 23 of its Council was dispensed with and the proposed ordinance was referred to the General Committee of the Council. At the September 3, 1946 meeting, by motion, Rule 23 was again dispensed with and proposed Ordinance 10349 was placed before the Council. The General Committee recommended to the Council that the original of proposed Ordinance 10349 "do not pass" and submitted in lieu thereof Committee Substitute for proposed Ordinance 10349 with the recommendation that it "do pass". By motion the Charter requirement of reading on three separate days was dispensed with and the Committee Substitute for proposed

Ordinance No. 10349 was placed on final passage. The Committee substitute was then passed, and as passed excluded from the Clay County area originally proposed to be annexed, that area within the boundary lines of the towns of Avondale and Randolph; and it also extended the effective date of the annexation from January 1, 1949 to January 1, 1950.

The evidence in the case took a wide range. It has been examined but it is impossible to even refer to all of it within the limits of this opinion. Since 1909, when relator annexed some 34.2 square miles in Jackson County to attain a total area of 59.6 square miles, it has had but one small growth in area. With one small Jackson County extension of about 2.8 square miles, effective January 1, 1947, it now has a total area of 62.4 square miles. Relator's central business district limited on the north by the Missouri River and lying substantially in the northwest corner of the city, is about 5 miles from relator's eastern city limits and about nine miles from the southern city limits. Relator is bounded on the west by the Kansas state line, and on the north by the center line of the Missouri River. In 1940 relator's population was 399,178, but is now reasonably estimated at 450,000 or more. Relator is an important business, industrial and residential city, is the center of, and the original city in a great metropolitan area. It is the trade center of a much larger area. In 1940 the population of that metropolitan area was 634,903. Relator's working population live all over that area as well as in Kansas City.

Respondent North Kansas City is primarily an industrial city. Such has been its history and development. In 1940 its resident population was 2688. That population is now estimated at 3500 to 4000. The record before us presents estimates that in respondent's many industries from 14,000 to 18,000 persons are employed. Many business firms in respondent purchase most of their merchandise in relator city. Respondent is located in low bottom land, south of the bluffs and north of the river; its present area is estimated at about four square miles. Of 858 employees in three of respondent's typical industries, a check revealed that 516 of such employees lived south of the river and 342 lived north of the river. Respondent and its proposed annexation area is almost identical in area with the North Kansas City School District. Its proposed annexation area contains about .8 square miles lying north and northwest of respondent, and includes that acreage upon which is now located relator's municipal water works plant, which lies just north of respondent.

From the southwest corner of respondent's city limits (which corner point is east of relator's municipal airport) the southerly line of respondent's city limits runs due east until it intersects the center line of the Missouri River. That exact point of intersection is difficult to determine from the exhibits or the record. However, from that point it follows the center line of the river until it intersects

the line of respondent's eastern city limits. The southwest corner of respondent's city limits is some distance north of the river. That small irregular area lying south of the south line of respondent's city limits (which runs due east and west) and north of the center line of the river, is included in relator's annexation area.

The area relator seeks to annex contains about 17.83 square miles (about 11,140 acres) in Gallatin Township, Clay County, Missouri, contiguous to and north of relator's present northern boundary. It is also contiguous to respondent and lies west, north and east of respondent. At its widest point north and south that area is about 5½ miles, east and west it is about 7 miles. Largely the terrain of this area is gently rolling. Practically the only rough land in the area is the bluffs north of the river and north of respondent. This rough land is small in acreage. In the low lying land immediately north and east of the bend of the river and just west and north of the respondent ▆▆▆▆ city, and in the southwestern corner of Clay County, relator now owns a quite large acreage presently used by it for a municipal airport and municipal waterworks. The latter lies north of respondent. The former lies west of respondent. Those lands lie south of the bluffs. Those two properties represent a heavy investment in Clay County. In May, 1947, the annexation area had an approximate population of 9460, was growing steadily in population, and 140 homes were then under construction. The major portion of the area is well adapted to residential use and capable of being used for city purposes. Two free bridges carry traffic over the river. Within the area there are 102.25 miles of highways, streets and roads, furnishing sufficient present access and traffic flowage. Within the area there are 2967 residences, 71 commercial buildings, 22 public and semi-public buildings, and 17 buildings used by industries. Its developed area totals 2814 acres and its vacant land (including three lakes) totals 8559 acres. Respondent seems to agree that 8675 acres may be classified as a residential section.

Thirty-two widely distributed improved tracts in the area have actually sold for an average of $401.37 per acre. Twenty-nine separate improved tracts therein sold for an average of $1146.45 per acre. The mains of the Clay County Water District No. 1 are reasonably well distributed throughout the annexation area, in which the water district has nearly 2400 customers. It also has water plugs in the area. Its water supply is purchased from relator. Within the area relator seeks to annex there are 80 platted subdivisions.

In the southeast corner of the annexation area lies 2325 acres referred to throughout the record, briefs and oral argument as the "southeast farm area". This area is not as well developed as the remainder of the land proposed by relator to be annexed, but it does contain 9 subdivisions. Respondent and intervenors contend this land is rural in character. Relator contends it is in transition from

agricultural to subdivision development. In it is one farm of 547 acres used as an experimental feeding farm, one farm of 80 acres and one of 258.8 acres. Other tracts therein are from 40 to 65 acres. The balance are small in area, ranging from 1 to 30 acres, and used generally to supplement the earnings of an urban employment. Other necessary facts will appear in the course of the opinion.

Under the four main divisions of its brief respondent presents nearly thirty subdivisions and cites nearly two hundred purported authorities, statutes, constitutional provisions, texts and charter provisions. Similarly, intervenors' brief presents twelve subdivisions and cites some fifty purported authorities. In some instances their points made are identical. While all the points made and all purported authorities cited have been carefully examined, within the limits of this opinion it is impossible to discuss all of them. However, the contentions of respondent and intervenors may be grouped, classified and briefly stated as follows: (1) relator has no power at all to amend its charter, (2) relator has no power at all to annex any territory to its corporate limits, (3) relator's Ordinance 10349 is void in law, and (4) relator's proposed annexation is factually unreasonable and for that reason is void.

■ We consider first respondent's contention that relator "cannot extend its (city) limits without amending its charter provisions as to boundaries, and it has no power (whatever) to amend its charter." That contention is based upon the argument that Sec. 20 of Article VI of the 1945 Constitution provides only for amendment "of any city charter adopted under the foregoing provisions", and that those last quoted words can refer only to the preceding Section 19; that relator's charter "was not adopted under *that section*"; that the above quoted words "under the foregoing provisions" must be construed to withdraw constitutional power to amend any charter of any city if such charter was adopted by such city prior to the effective date of the 1945 Constitution; and that as relator's 1925 charter was in fact adopted under the authority of Sec. 16 of Article IX of the 1875 Constitution, as that section was adopted into the 1875 Constitution in 1920, there is now no constitutional authority to amend relator's charter. Respondent ■ cites and relies on State ex inf. Attorney General v. Maitland, 296 Mo. 338, 246 S. W. 267, 269. We do not agree with respondent's above stated contention.

It is true that when relator's present charter was adopted in 1925, the then constitutional authority to adopt it was Sec. 16 of Article IX of the 1875 Constitution. The substantive and procedural provisions of Sec. 16 of Article IX of the Constitution of 1875 (with a few changes as to the form thereof) were written into what is now Sec. 19 of Article VI of the 1945 Constitution.

The present constitutional authority to amend a city charter is in Sec. 20 of Article VI of the 1945 Constitution, in these words:

"Amendments of any city charter. adopted under the foregoing provisions may be submitted to the electors by a commission as provided for a complete charter. Amendments may also be proposed by the legislative body of the city. * * * The (city) legislative body shall at once provide, by ordinance, that any amendment so proposed shall be submitted to the electors at the next election held in the city not less than sixty days after its passage, or at a special election held as provided for a charter. Any amendment approved by a majority of the qualified electors voting thereon, shall become a part of the charter at the time and under the conditions fixed in the amendment"; etc. The just above quoted provisions were in Sec. 17 of Article IX of the 1875 Constitution, with this exception, that, in the first sentence of the above quoted section, after the word "under", in lieu of the words "the foregoing provisions", Sec. 17 of Article IX of the 1875 Constitution used the words "the authority of section 16 of article IX *of this Constitution*". (Emphasis ours)

In State ex inf. Attorney General v. Maitland, supra, relied on by respondent, this court, in 1922, was considering a 1921 amendment to Kansas City's then charter, which charter had been originally adopted in 1908. Secs. 16 and 17 of the 1875 Constitution had been adopted into that Constitution by amendment effective November 2, 1920. We there held that relator's 1908 charter there considered, under the particular wording of what was then Sec. 17, i. e., "Amendments of any (city) charter * * * adopted under the authority of section 16 of article IX *of this Constitution*" was not such a charter as could be amended under Sec. 17, adopted in 1920, for it "could have no reference to charters adopted prior to the amendment of November 2, 1920". That case was correctly ruled, but we are here considering a different section and wholly different language.

The language of Sec. 20 of Article VI of the 1945 Constitution, above quoted, i. e., "under the foregoing provisions", contains no reference to any certain section or to any certain Constitution. Relator's 1925 charter, while not adopted under Sec. 19 of Article VI of the 1945 Constitution (which Constitution was not then in existence), was certainly adopted *under the provisions* contained in Sec. 16 of Article IX of the 1875 Constitution and also contained in Sec. 19 of Article VI of the 1945 Constitution. Such provisions were "foregoing". At no place in the 1945 Constitution and by no language used therein does there appear any intention to withdraw from municipalities the right to amend their constitutional charters adopted before the effective date of the 1945 Constitution. On the contrary, the language used in Sec. 20 of Article VI (changed from old Sec. 17) shows that the intention of the people of the state in adopting it was to permit such city charters (theretofore adopted) to be amended.

Hence we rule that at the time the events in issue here occurred relator had the constitutional authority to amend its city charter

and that it derived such authority from Sec. 20 of Article VI of the 1945 Constitution. Barnes v. Kansas City, 359 Mo. 519, 222 S. W. (2d) 756. By Mo. R. S. A., Sec. 7241.101 (Laws Mo. 1945, p. 1309) which became effective March 7, 1946, relator received legislative sanction to amend its charter ''by complying with the provisions of Secs. 19 and 20 of Article VI of the (1945) constitution of this state''. That authority it theretofore constitutionally had. That statute was not necessary to ▮▮▮ give relator that power it already had from the Constitution itself. By Sec. 487 of relator's charter it is provided that such charter ''may be amended in the method provided by the Constitution of the state of Missouri''. Relator could not give itself the power of charter amendment, but that charter provision merely pointed out the necessity of compliance with the Constitution.

▮▮▮ Respondent next contends that even if relator has authority to amend its charter, relator has no power at all to annex any territory to its corporate limits. This contention is based upon the argument that power to amend a city charter must be limited to a charter only ''for its own government'' (see Sec. 19, Article VI of the 1945 Constitution) and does not carry with it the power to extend its limits; that R. S. Mo. 1939, § 7626, Mo. R. S. A., is relator's only possible grant of annexation power; that other than Sec. 7626 relator is wholly without any authority to extend its corporate limits at all; and that that statute grants that power only upon condition that three-fifths of relator's electors voting thereon vote in favor of such proposal. Relator's instant annexation proposal received a majority but not a three-fifths vote. It is relator's position that the extension of its city limits is authorized by Secs. 19 and 20 of Article VI of the 1945 Constitution; and that having constitutional authority it needs no statutory authority.

In three cases affecting the extension of relator's city limits, we have heretofore ruled adversely to respondent's instant contentions and no reason exists to now depart from the rule of those cases. City of Westport v. Kansas City, 103 Mo. 141, 15 S. W. 68, Kansas City v. Stegmiller, 151 Mo. 189, 52 S. W. 723, State ex inf. Major, Attorney General v. Kansas City, 233 Mo. 162, 134 S. W. 1007. In the City of Westport case, Kansas City and Westport were attempting to effect the annexation of Westport to Kansas City. We there said that, ''It is too plain to admit of any doubt that any act on the part of Kansas City which contracts or expands its territorial jurisdiction is an amendment of its charter. * * * The conclusion cannot be escaped that the ordinance in question, extending the limits, is an amendment of the charter, and an amendment, too, within the purview of said section 16 of article 9 of the constitution.''

In the Stegmiller case, supra, after the annexation of the City of Westport to the City of Kansas City had been effected, one Stegmiller,

former Collector of the City of Westport, was sued by Kansas City for monies collected for Westport and which he had failed to turn over to the City of Westport. He admitted he had collected the monies but contended he owed such monies to Westport, not to Kansas City. In his answer filed in the court below Stegmiller attacked the annexation proceedings. Upon his appeal here Stegmiller asserted that neither by the Constitution nor by any law of the state was Kansas City granted any authority whatever to annex any territory. In our opinion in Stegmiller's case, we re-affirmed our former conclusions in the City of Westport case, and in part said: "Both upon the authority of that case (City of Westport v. Kansas City) and the obvious reading of the constitution, we hold that, in so far as the action of Kansas City alone is concerned, there is a plain constitutional grant of the power to extend its limits, and a definite mode pointed out."

In State ex inf. Major, Attorney General v. Kansas City, supra, we had before us the validity of relator's 1909 annexation of some 34.2 square miles. That original quo warranto action by the Attorney General sought to have us adjudge to be void Kansas City's charter amendment authorizing the above annexation, and to oust Kansas City of municipal jurisdiction over that annexed territory. In again ruling the source of Kansas City's power to annex territory we there said: "Under the decisions of this court, the power of the respondent (Kansas City) to amend its charter and the vote necessary therefor, like the power to adopt the charter in the first instance and the vote required for that purpose, is derived directly from the Constitution, and ▄▄ no charter or legislative provision was necessary in either case". We there also held that the constitutional provision authorizing a charter amendment, and "the acceptance of the same by the requisite number of qualified voters", was self-enforcing and was "not subject to change or modification, either by charter enactment of the city or by act of the General Assembly".

Sec. 20 of Article VI of the 1945 Constitution is likewise self-enforcing. That section supplies a rule for the enjoyment of the right granted; it descends to details and provides that amendments to city charters may be proposed by the city legislative body by ordinance and submitted to the city's electors at a certain election; that if approved by a majority voting thereon the amendment shall become a part of the charter at the time and under the conditions therein fixed. State ex rel. Randolph County v. Walden, 357 Mo. 167, 206 S. W. (2d) 979.

We have examined the cases cited by respondent and intervenors as supporting their position. But we find that no Missouri case, cited or uncited, detracts an iota from the force of our rulings in the Westport, Stegmiller and Major cases. All cases cited to us by respondent and intervenors are such as Kansas City v. J. I. Case Threshing

Machine Co., 337 Mo. 913, 87 S. W. (2d) 195, 198, and State ex rel.
Carpenter v. St. Louis, 318 Mo. 870, 2 S. W. (2d) 713, and State ex
rel. Behrens v. Crismon et al., 354 Mo. 174, 188 S. W. (2d) 937, which
do not minimize our previous rulings, and are readily distinguishable
upon both facts and conclusions. Space forbids detailed discussion
of the many cases cited. Our previous construction of the provisions
of the Missouri Constitution as exemplified in the three above quoted
from cases is vigorously assailed by respondent and intervenors.
They cite certain cases in other jurisdictions, California, Oregon,
Washington and Michigan. The courts of those states in construing
the constitutions of those states seem to have ruled that *their* con-
stitutional and statutory provisions empowering cities to adopt and
amend city charters do not ipso facto grant also to such cities the
power to extend city boundaries, and seem to hold that additional
specific legislative authority is necessary to warrant annexation.
We have carefully examined those cases and the constitutional pro-
visions of each such state as then in force. They are unlike our con-
stitution. If such provisions were identical we would feel no compul-
sion to depart from our previous rulings, and follow off after the
rulings in other states. And we decline to do so.

As above ruled, relator has authority to amend its charter. An
extension of relator's corporate limits must be by and is an amend-
ment of its charter. City of Westport v. Kansas City, supra, City of
Kansas City v. Stegmiller, supra. The character of the authorized
charter amendment is not constitutionally limited. A municipality has
such powers as are "necessarily or fairly implied in or incident to
those expressly granted" and such as are essential to its objects and
purposes. The right of charter adoption and amendment carries with
it the right to so amend as to effect lawful annexation. Those rights
are not separable. It is crystal clear that in adopting the Constitu-
tion, wherein by force of such fact of adoption the people of the state
granted certain cities the right and privilege of adopting and living
under a home rule charter, and the constitutionally unlimited right
and privilege of amending such charter in the manner therein
provided, that the same people, by token of the same act of adoption,
did not ipso facto withhold from such segment of themselves the
privilege of growth, expansion and urban well being so often attain-
able only through lawful annexation. And it is likewise clear that
such right or privilege so granted such cities by the grace and favor
of the people's suffrage, after being so bestowed, was not ipso facto
withdrawn by the mere failure to bestow such right of annexation
in express terms. The citizenship of the state plainly intended to give
such cities the right to determine for themselves the kind of charter
under which they should live. But no intention appears to stifle
growth and expansion. On the contrary, a mobile era, an unprece-
dented density of population in urban areas and a great need

for urban advantages and services in suburban areas where so many urban workers reside, were all concomitant with the day of our Constitution's adoption and were within the common knowledge of those who, in 1945, by their vote adopted it. The power to lawfully annex and the right to grow in area by such annexation are necessarily and fairly implied in and are incident to the power of charter adoption and amendment expressly granted by the Constitution. Such a right of lawful annexation, i. e., growth in area by charter amendment, is both necessary and essential to the objects, purposes and very existence of such a municipality. Changes in territorial limits of municipal corporations to meet new and changing conditions are favored by the law.

The powers which relator could exercise, through the constitutional grant of the right to adopt and amend its charter were such "powers which the people of the city delegate to it under its charter, if unrestrained by constitutional limitation". Kansas City v. Frogge, 352 Mo. 233, 176 S. W. (2d) 498, 499. And by Sec. 5 of Article I of its charter the people of relator city delegated to relator the power to "extend its limits by amendment of this charter in the manner provided by the Constitution", etc.

Whatever may be the rule in any other jurisdiction, or however any court in some other jurisdiction may have construed some other constitution, we hold that under the Constitution of Missouri relator has a constitutional grant of power and authority to extend its city limits by amendment of its charter in compliance with Sec. 20 of Article VI of the Missouri Constitution of 1945. Specific legislative authority to extend relator's limits is unnecessary. It was legally sufficient for adoption that a majority of the qualified electors voting thereon approved relator's proposal to amend its charter to extend its boundaries. The approval by a majority met constitutional requirements.

The briefs and argument of both respondent and intervenors have at such length and with such earnestness emphasized and relied on the provisions of R. S. Mo. 1939 § 7626, Mo. R. S. A., that we lengthen this opinion to here note additional reasons for the inapplicability of that statute. If legislative authority to annex were necessary (and we ruled above that it is not) the three-fifths acceptance vote provision of Sec. 7626 in any event violates Sec. 20 of Article VI of the 1945 Constitution, which requires only a majority acceptance vote.

What is now Sec. 7626 was first passed in 1887. Laws Mo. 1887, page 49, Sec. 41. It then authorized not only an amendment of the city charter, but it also contained procedural provisions under which one city could annex another city by a four-sevenths vote of each of such cities. This statute was discussed at length in the City of Westport and Stegmiller cases, supra. In 1895 the statute was amended (Laws Mo. 1895, page 54) and the last proviso requiring a

three-fifths acceptance vote was added. At that time Sec. 16 of Article IX of the 1875 Constitution, then in effect, and authorizing amendments of the city charters, required a three-fifths acceptance vote for adoption of such amendments. The constitutional provision for adoption of city charter amendments by only a majority vote was not adopted into the Constitution until November 2, 1920, and then as Sec. 17 of Article IX. The three-fifths acceptance vote provision of Sec. 7626 (as yet unchanged since 1895) was so written into that statute in 1895 to comply with the identical (three-fifths) provision of the Constitution, as it existed in 1895.

When the people of Missouri, on November 2, 1920, replaced old Sec. 16 of Article IX (which required a three-fifths acceptance vote) with new Sec. 17 of Article IX (which required only a majority acceptance vote) then, even if a statute authorizing annexation had been necessary (which it was not), that constitutional change by the people wholly and forever nullified the three-fifths acceptance vote requirement of what is now Sec. 7626. State ex rel. Morgan v. Hemenway, 272 Mo. 187, 198 S. W. 825. Upon the adoption of the 1920 amendment an irreconcilable repugnancy between the Constitution and the ▮▮▮▮ statute came into existence. ·The same is true with respect to the 1945 Constitution. Sec. 20 of Article VI requires a mere majority acceptance vote. By Sec. 2 of the Schedule of the 1945 Constitution (Laws Mo. 1945, page 60) it is provided that "All laws inconsistent with this Constitution, unless sooner repealed or amended to conform with this Constitution, shall remain in full force and effect until July 1, 1946". In that respect (after July 1, 1946) Sec. 7626 was certainly inconsistent also with and repugnant to the 1945 Constitution.

Therefore, if specific legislation had been, necessary to . confer annexation authority upon relator (and we repeat, it was not necessary) the three-fifths acceptance vote provision of Sec. 7626, being in direct conflict with both the 1920 constitutional amendment (Sec. 17 of Article IX) and also in conflict with Sec. 20 of Article VI of the 1945 Constitution, was already void, and had no effect whatever upon relator's instant annexation proceedings. The three-fifths acceptance provision of Sec. 7626 being unconstitutional after the adoption of Sec. 17 of Article IX on November 2, 1920, after that date was no law and conferred no rights at all. No life was later breathed into it by its retention in the 1929 and 1939 revision of our statutes. State ex rel. Miller v. O'Malley, 342 Mo. 641, 117 S. W. (2d) 319, 324. The approval of relator's proposed charter amendment by a majority of its electors voting thereon at the general election held on November 5, 1946, complied with constitutional requirements as to the vote said charter amendment by law was required to receive to become effective.

It is next contended by respondent and intervenors that because the area proposed to be annexed, as described in relator's proposed Ordinance 10349 introduced on August 19, 1946, included the little towns of Avondale and Randolph, that for that reason that proposed ordinance was utterly void; and that the proposed ordinance conferred no jurisdiction or priority as to subject matter on relator, because, being void, it could not be amended during its passage through relator's City Council. As above noted the proposed ordinance, before final passage and before it became an ordinance in fact by final passage and approval, was amended as to description to eliminate Avondale and Randolph, and was also amended as to the effective date. In support of their above contention we are cited to Pascagoula v. Krebs, 151 Miss. 676, 118 Sou. 286, and other like cases. The rule of those cases was applicable under the facts of those cases. But in the Pascagoula case the proposed ordinance was not amended to eliminate certain territory lying within another city, and which had been included therein. That rule has no application here for relator's proposal as passed by its council and as approved by relator's electors on November 5, 1946, did not include Avondale and Randolph. The procedure followed in the passage of the proposed Committee Substitute complied with relator's charter and the Standing Rules of its Council. Was the Committee Substitute for proposed Ordinance 10349 such an amendment of the original proposed Ordinance 10349 as could legally be made? We hold that it was.

Plainly the proposed Committee Substitute operated as an amendment of the original proposed ordinance. The general purpose of original proposed Ordinance 10349, as introduced on August 19, 1946, was to submit to relator's electors a proposal to amend its charter to extend relator's city limits northward into Clay County for the purposes therein stated. An amendment by a Committee Substitute to change the effective date and to exclude therefrom a certain area (theretofore included) could in no wise change the general purpose and was not inconsistent with the object of the original proposed ordinance. It was wholly consistent. The "general purpose" does not include the mere details through and by which the purpose is manifested or effectuated, nor the mere description of an area mentioned therein. It means the broad purpose intended to be accomplished as the objective of the legislation. The amendment was germane to the original general purpose and could not possibly cause relator to lose its jurisdiction of the subject matter, nor any priority it had attained by the introduction of its original proposal on August 19, 1946. Such an amendment of its proposal relator could legally make. State ex rel. McCaffery v. Mason, 155 Mo. 486, 55 S. W. 636, Hood v. City of Wheeling, 85 W. Va. 578, 102 S. E. 259, Vestal v. City of Little Rock, 54 Ark. 321, 16 S. W. 291.

■ It is next contended that relator's Ordinance 10349, as passed by its Council on September 3, 1946, and approved by its mayor was not an emergency measure; that not being such it could not have become effective until September 13, 1946; and that having been voted on by relator's electors on November 5, 1946, that election was premature and void for having been held "not less than sixty days after its passage" as required by Sec. 20 of Article VI of the 1945 Constitution.

While it is not the declaration by a legislative body that a statute or an ordinance is an emergency measure which makes it such; and while it is the function of the courts in a judicial proceeding to determine whether a statute or an ordinance is in fact an emergency measure within the law (State ex rel. Asotsky v. Regan, 317 Mo. 1216, 298 S. W. 747), we observe that Sec. 15 of Article II of relator's charter provides that "any ordinance * * * providing for the submission of any proposal to the people" is an emergency measure. An examination of this ordinance in this record shows it did provide for the submission of a proposal to the people. That was a constitutional requirement. The original proposed ordinance declared "the submission of a charter amendment to the people of Kansas City, Missouri, is hereby declared an emergency measure within the meaning of section 15, article II of the Charter of said city", etc. It was likewise so declared in the title. The Committee Substitute was likewise declared, both in the title and the body thereof, to be an emergency measure.

Intervenors complain that the emergency was not declared in the preamble of the proposed ordinance. But intervenors have overlooked the provisions of Sec. 15 of Article II of relator's charter stating that the character of the emergency required to be stated in a preamble is one "for the preservation of the public peace, property, health, safety and morals." From the time of introduction of the proposal to the time of passage of respondent's ordinance fifteen days elapsed. It was not rushed through in one day as was respondent's Ordinance 1193. The provision in relator's charter declaring that an emergency measure is one "providing for the submission of any proposal to the people" is not an unlawful or unreasonable one. This proposal requiring a submission to the people for their approval or rejection in an election was an emergency measure. Relator's City Council had the lawful right to so denominate this an emergency measure and we hold that in fact it was such. This contention is not well taken and is overruled.

■ Contiguity. It is contended that relator's proposed annexation area is not contiguous to its present area. Relator's present north city limits, as defined in its charter is the center line of the river. That center line is the northern boundary of Jackson County, and the southern boundary of Clay County, R. S. Mo. 1939 § 13560,

13620, Mo. R. S. A. The area in Clay County described in relator's charter amendment is contiguous to relator's present northern boundaries and the contiguity is not broken by the Missouri River. McQuillin Municipal Corporations, 3rd Ed. Vol. 2, p. 312, Sec. 7.20; Vestal v. Little Rock, 15 S. W. 891; Vogel v. Little Rock, 54 Ark. 335, 15 S. W. 836. It is stated that at one point along the west side of respondent, the relator's proposed annexation area is not over 200 feet wide. But that does not render the annexation void, nor break the contiguity. Sharp v. Oklahoma City, 181 Okla. 425, 74 Pac. (2d) 383. City of Wichita Falls v. Bowen, 143 Tex. 45, 182 S. W. (2d) 695, 154 A. L. R. 1434, Lefler v. City of Dallas, (Tex.) 177 S. W. (2d) 231, McQuillin Municipal Corporations, 3rd Ed. Vol. 2, p. 312.

Several tracts may be annexed as being contiguous if one tract is contiguous to the annexing municipality and the other tracts are contiguous to that tract and each other. In any event, relator's "Northeast Industrial Area", lying in the northeastern portion of relator and directly across the river from the "southeast farm area" is conceded by respondent and intervenors to be contiguous to that "southeast farm area". It is held in Missouri that it does not affect the contiguity of the land proposed to be annexed nor impair the validity of the proposed annexation that a city in one county proposed to annex a contiguous area located in an adjoining county. Schildnecht et al. v. City of Joplin, 226 Mo. App. 47, 41 S. W. (2d) 590, 595. We approve that ruling. We hold that the proposed annexation area of relator is contiguous to its present area.

Reasonableness. Respondent and intervenors further contend that relator's proposed annexation is oppressive, unfair and unreasonable and is therefore void. Bearing upon this phase of the case, we held in State ex inf. Mallett ex rel. Womack v. City of Joplin, 332 Mo. 1193, 62 S. W. (2d) 393, that if the question of the reasonableness of the proposed annexation is "fairly debatable, that is, if there was substantial evidence each way so that reasonable men would differ about its necessity, then the decision of that question (of reasonableness) was for the city council and the city electorate and not for the court". The passage of the ordinance and its approval by the electorate makes a prima facie case of reasonableness and the burden of proving unreasonableness rests on those asserting it. Hislop v. City of Joplin, 250 Mo. 588, 157 S. W. 625, McQuillin Municipal Corporations, 3rd Ed., Vol. 2, p. 322, Sec. 7.23. And the courts resolve any doubt as to reasonableness of such an ordinance in favor of its reasonableness. State ex inf. Major v. Kansas City, supra.

In the last named case, we announced certain guiding principles upon the question of reasonableness of annexation proposals and held that contiguous lands may be annexed to a city, "(1) when they are platted and held for sale or use as town lots; (2) whether platted or not, if they are held to be brought on the market

and sold as town property when they reach a value corresponding to the views of the owner; (3) When they furnish the abode for a densely settled community, or represent the actual growth of the town beyond its legal boundary; (4) when they are needed for any proper town purposes, * * * or to supply places for the abode or business of its residents, or for the extension of needed police regulation; and (5) when they are valuable by reason of their adaptability for prospective town uses", etc. Upon this question we also consider whether the territory proposed to be annexed has city advantages, or would make the city limits regular, or would tend to secure uniform grade and street alignment, or is required by public convenience, or is necessary to foster the growth and prosperity of the city. See also, Copeland v. City of St. Joseph, 126 Mo. 417, 29 S. W. 281, State ex inf. Mallet ex rel. Womack v. City of Joplin, supra, Seifert v. City of Poplar Bluff, (Mo. App.) 112 S. W. (2d) 93, City of Sugar Creek v. Standard Oil Co., 163 Fed. (2d) 320.

It is contended by respondent that relator's proposed annexation is unreasonable because it "encircles" the respondent. But relator did not "encircle" respondent. For years the latter has been hemmed in on the west by relator's municipal airport and by the river. For years the river has hemmed respondent in on the south. For many years relator has had its municipal water plant just northwest of respondent. We are cited to Nolting v. City of Overland, 354 Mo. 960, 192 S. W. (2d) 863. It is true that in that case Overland's proposed annexation area did completely encircle four different villages. But our ruling that Overland's proposed extension was unreasonable was not based on the encircling factor alone, if, indeed, it was at all. We affirmed the trial court's judgment in that case, but many, many other factors of unreasonableness, as shown by our opinion, affirmatively appeared there. Among such factors were that much of the land proposed by Overland to be annexed was farm land neither needed nor useful by Overland for any municipal purpose whatever; and that a city of only 474 acres and 3,000 inhabitants proposed to annex 5591 acres and 30,000 inhabitants. Other equally cogent reasons were there stated. We there stated only that "no case has been found where a court has sustained an ordinance extending the city limits to the extent attempted by the ordinance in this case." We do not consider the Overland case an authority for respondent's position.

This contention presents a many faceted question. No unalterable answer to that question may be given. It must depend upon the facts and circumstances of each individual case. Respondent has not experienced the origin, growth and development of the usual city. Except for Kansas City, Missouri, and the need of certain industrial interests there centered for factory, warehouse and railroad facilities near to the business district of Kansas City, Missouri; and except for

the vision of certain industries foresighted enough to purchase the land and begin the development, there would have been no North Kansas City. Now a well established, energetic, industrial community, respondent started a comparatively few years ago from humble industrial origins. And while its resident population is now estimated at more than 3500, it is today basically an industrial city. Only 10% of respondent's area is zoned for residences, and 90% of its territory is zoned for industrial and commercial uses. Of its now vacant land, Mr. Roberts, respondent's mayor, testified that the major portion thereof is owned by the Burlington Railroad and the North Kansas City Development Company. The latter now owns 65% of the vacant land. In respondent's corporate limits there are only 700 houses but there is now room for 300 more. In over ten years that area zoned for residences has not built up. In 1945 respondent's Post-war Planning Committee reported to respondent that, as the expense was so great to undertake an extension of its limits, such extension should be postponed until at least 1950. Mayor Roberts thereupon made that recommendation also to respondent's City Council. Accordingly, respondent did nothing at all to extend its limits. But after relator introduced its proposed ordinance on August 19, 1946, respondent's Council immediately, and on the following day passed respondent's annexation ordinance.

The contention now under consideration was the only question before the court in City of Houston v. State ex rel. City of University Place, (Tex.) 176 S. W. (2d) 928. There, as here, each city was seeking to annex the same territory which was contiguous and adjacent to each such city. University Place there contended Houston's proposed annexation was unreasonable because it "resulted in encircling" University Place. In that case the court held that it could not be judicially held that Houston's ordinance "was so unrelated to petitioner's (Houston's) *economic and municipal needs* as to be wholly unreasonable and arbitrary and for that reason subject to judicial review. Such action invaded none of the property or constitutional rights of respondents" (University Place). In the case of People ex rel. Peck v. City of Los Angeles (Cal.), 97 Pac. 311, 314, it was likewise held that, "* * * there is no law which prohibits another municipality, *when its present municipal necessities require it*, from extending its boundaries by annexation because such extension may possibly prevent future expansion of another municipality". (Emphasis ours) See also, 62 C. J. S., Municipal Corporations, § 46, p. 138.

The facts and circumstances of this case make these two cities, and their relation to each other, quite unique. In our research we have found no adjudicated case comparable upon the facts. While this point here considered is made in respondent's brief it has not been developed at any length. It is there suggested, however, that

respondent being "near railroad tracks and industrial establishments is not a reasonable location for residences". That suggestion overlooks the fact that respondent now is and has always been basically an industrial city. It was originally located where it now is because that location was convenient to business, and near industries and railroads. It quite overlooks the fact, too, that respondent sat by and omitted all action until relator had introduced its proposed ordinance on August 19, 1946. We hereinafter consider certain ■■■■■ factors of relator's economic and municipal needs which con-·clusively demonstrate there is no merit in this particular contention.

But we hold that the mere fact alone that relator's proposal to annex that territory north and east of respondent, and the mere fact alone that if relator's proposed annexation is approved respondent's future opportunity for territorial growth by annexation of contiguous territory is of necessity ended, does not ipso facto render relator's proposed annexation unreasonable.

■■■ We will hereinafter separately consider the "southeast farm area", but we confine the discussion in this and the next succeeding paragraph to relator's annexation area, exclusive of the "southeast farm area". By attempting to annex much of this area (exclusive of the "southeast farm area") respondent, as of course, concedes that at least the portion it seeks to annex comes within the rules as to reasonableness above quoted from State ex inf. Major v. Kansas City. Respondent's brief concedes this is a "residential section". Intervenors' brief concedes it has the "characteristics of a suburban area". And it affirmatively appears from the record and exhibits that the portion of relator's annexation area here under consideration has reached such a state of development that it is urban in character and furnishes the abode for a reasonably densely settled community. The record shows the terrain (except that small portion above noted as the bluffs) is adaptable to residential uses. While respondent contends the resident population within this particular area and the growth of population therein are due solely to overflow from respondent, that is not borne out by the record. The record tends to show many residents of this area moved into the area from each city, relator and respondent. Many of them travel into relator city each day to their business. Many of them work in the respondent city. At least a portion of the population of this area represents a growth of relator beyond its legal boundaries. Relator has about reached its normal growth within its present area and is about as heavily populated as the average American city in this motor age. To the inhabitants of this area, relator has the nearest available public and private hospitals, theatres, concerts, metropolitan shopping centers, wholesale establishments, art galleries, hotels, railroad terminals and places of major public amusement. There is no lack of community interest between the inhabitants of the area and relator.

This record amply supports the conclusion that relator is prepared to and can substantially benefit this area (and the entire area) and those who live therein by the furnishing of such municipal services as zoning, sewers, police and fire protection, etc. Cost estimates of certain municipal services for portions of the area have been made by relator and are in the record. At the time of the oral argument of this case in this court (which was after the effective date of the extension as fixed in relator's ordinance), certain municipal services were being furnished by relator to this area. This area is growing steadily in population. Its topography is adaptable to streets and sewerage. It appears that the value of the land within the area, which has not yet been platted and is being held for town purposes, is much in excess of its value for rural purposes. The land attained that value because it is adaptable for prospective town purposes. The market value of such land is many times its rural value. If relator's proposed annexation area is permitted to be included within relator's limits, not only will relator's boundaries become more regular but relator will then have a large, desirable and attractive residential area with a large population within a more reasonable distance of relator's down town area and central business district. That will stabilize property values in relator's central business district and will help solve its morning and evening traffic problems. Relator's expansion to the south (as to the distance from its central business district) has thrown it out of balance. A quite substantial portion (71 subdivisions) of this area is platted and either sold or for sale as town lots for home building. Exhibit 41 (filed here) showing the location of the ▮▮▮▮ area subdivisions indicate they are well distributed throughout the annexation area. The area is needed for city purposes and to foster relator's prosperity and future growth. And in that respect relator is not limited to its immediate needs. State ex inf. Major, Attorney General v. Kansas City, supra. The above facts, and the plain economics of relator's present and future municipal necessities, as presented by the testimony in this record, leads only to the conclusion that, within the principles we have heretofore announced, the annexation by relator of this portion of the entire area is certainly not unreasonable. These questions must always be ruled upon the facts of each case.

▮▮▮▮ As to the "southeast farm area". While there is some farm land in this particular area there are therein also nine subdivisions with a total area of 285.5 acres. More than 12% of the land in this particular area is in platted subdivisions. Two of those subdivisions were filed since 1930. It is strongly urged that the inclusion of this so-called farm area within that entire area relator proposes to annex, of itself renders relator's entire proposed annexation unreasonable and invalid. This particular area is about 20% of relator's proposed total annexation area. It is now sparsely settled and needs highways.

Some of this area is comparatively rough land, but much of the area has a quite high value. It has that value not because of its present country use but because of its prospective town use. In the Major case, supra, respecting relator's 1909 annexation, we said, "* * * nor does it matter that a considerable part of the land is at present used for agriculture; as its value is derived from prospective town use and not from its present country use it might properly be included within the city." Thirty-two well distributed separate tracts in the farm area have an average fair market value of $299.97 per acre but their agricultural value is only $63.39 per acre.

Relator's "northeast industrial district", a large area within its present borders is situate in the northeastern part of the city and just south of the Missouri River. That area, by reason of dikes recently constructed along the river's south bank is now available for industrial occupation and use. Sewers are now to be constructed therein. It is the only territory within relator now available for use by large and heavy industry, and lies directly south across the river from the "southeast farm area". It is not unreasonable that the "northeast industrial district" will reasonably soon be filled with such industrial plants. Relator has reason to believe and is justified in expecting that will occur. It is indicated in the record that a recently abandoned railroad bridge (now connecting the "northeast industrial district" in Jackson County and the "southeast farm area" in Clay County) will be made available for highway traffic. Relator is under the necessity of constructing a new airport. It is recommended that it be located in Clay County east of the "southeast farm area". Employment will be there provided for about 8,000 people. The "southeast farm area" is an inviting and likely district of residence for workers both at the new airport and in relator's "northeast industrial district". Considering the size, population and relatively certain growth of relator; the necessity for its new airport; the future of the "northeast industrial district"; the present value of the land in the "southeast farm area" and its usableness for town purposes; the reasonable conclusion from the evidence of the necessity of highway traffic over the bridge from the "northeast industrial district" to the "southeast farm area" and the contiguity of the "southeast farm area" to relator and to the remainder of its entire annexation area, it is our view that it was not at all unreasonable for relator to include the "southeast farm area" in its annexation area. We hold that the inclusion of the "southeast farm area" in relator's entire annexation area did not render it invalid.

Respondent, in its argument against the reasonableness of relator's proposed annexation, suggests the possibility of many governmental, administrative, tax and procedural difficulties which it fears relator may possibly encounter if a portion of its city should be within another county. Those suggested matters are not before us for ruling.

They may never be here. We can rule only the matters that are now here. This case has presented enough difficulties in the matters now properly here. And those possibilities suggested by respondent cannot militate against nor determine the legal questions this record presents.

Neither respondent nor intervenors have met the burden imposed on them by law of establishing that relator's ordinance was unreasonable. The unreasonableness of relator's proposed extension not having been established by those upon whom the burden to prove such fact rests, the question of reasonableness of relator's charter amendment in any event, was primarily "for the city council and the city electorate and not for the court." State ex inf. Mallett ex rel. Womack v. City of Joplin, supra and Hislop v. City of Joplin, supra.

Inasmuch as respondent and intervenors have not established unreasonableness, the motives of relator's city officials in initiating the annexation proceedings and the motives of relator's electors in approving the annexation at the polls, as characterized by some of the intemperate language in respondent's brief and argument, are not for determination in this forum. Much of the testimony in this record was introduced by the parties as bearing upon the issue of reasonableness. From that testimony we cannot say that the question of reasonableness is not a "fairly debatable" one. But notwithstanding the rule of the last above named cases, we have independently examined and carefully considered the question of reasonableness. This case has received the attention which its importance demands, and our conclusion, after a thoughtful consideration of the record, exhibits, contentions briefed and authorities cited, is, and we hold, that relator's instant charter amendment providing for the extension of its city limits, is reasonable. See also, Central Missouri Oil Co. v. City of St. James, 232 Mo. App. 142, 111 S. W. (2d) 215, Jones v. City of Ferguson, (Mo. App.) 164 S. W. (2d) 112, Ozier v. City of Sheldon, (Mo. App.) 218 S. W. (2d) 133.

We have above disposed of the contentions made here by both relator and intervenors.

Under the above circumstances, and in view of our above stated conclusions, is it necessary for us to consider any of the issues raised by the pleadings and the evidence as to the annexation proceedings attempted by respondent? All issues as to respondent's ordinance pass out of the case if, by the institution of relator's annexation proceedings on August 19, 1946 (and prior to the institution of respondent's proceedings on August 20, 1946). relator acquired such "prior jurisdiction" of the subject matter thereof as to entitle it to carry those proceedings through to a conclusion. If, by priority, relator did not so acquire such jurisdiction, then there remains open for ruling here the legality of the respondent's annexation ordinance.

Under the instant circumstances, the well established doctrine of "prior jurisdiction" must be applied. We so held (and applied it)

in State ex inf. Goodman ex rel. Crewdson v. Smith, 331 Mo. 211, 53 S. W. (2d) 271. In that case there was introduced in the Council of the City of Louisiana, on May 3, 1929, a proposed ordinance to extend its limits to include a certain area contiguous to that city. On May 13, 1929, the inhabitants of that area presented a proper petition, and on that day the county court made an order incorporating Louisiana's proposed annexation area as the village of Elmwood. The proposed ordinance of Louisiana was not passed until May 14, 1929. Upon the appeal of a quo warranto proceeding filed by Louisiana to test the validity of Elmwood's incorporation, we held that "when several separate authorities have concurrent jurisdiction of the same subject matter, the one in which proceedings were first commenced has exclusive jurisdiction to the end of the controversy". We there sustained the right of Louisiana to carry its first instituted annexation proceedings through to a conclusion. The impact of that principle cannot be escaped here. A situation identical with the instant one was before the Texas Supreme Court in City of Houston v. State, supra. In that case the City of Houston and the City of West University Place each sought to annex the identical territory which was contiguous to each of those cities. The doctrine of "prior jurisdiction" was there recognized. Under the circumstances which obtain in this case the doctrine is universally recognized and applied. See also, Popenfus v. City of Milwaukee, 208 Wis. 431, 243 N. W. 315, State ex rel. Johnson v. Clark, 21 N. D. 517, 131 N. W. 715, People v. City of Monterey Park, 40 Cal. App. 715, 181 Pac. 825, McQuillin Municipal Corporations, 2nd Ed. Vol. 1, p. 476, 43 C. J. Municipal Corporations, p. 83.

Inasmuch as relator's charter amendment extending its city limits northward into Clay County, Missouri, was legally passed by its City Council and approved by its mayor; and inasmuch as said charter amendment was thereafter legally adopted and approved by relator's electors, all as required by the Constitution; and inasmuch as it is conceded that the proceedings to so amend its charter as to extend relator's city limits northward into Clay County were instituted and begun prior to the time respondent instituted its proceedings to extend its limits and thereby annex a portion of the area relator proposed to annex, we cannot escape the ruling that (1) relator, by the institution of its prior proceedings on August 19, 1946 thereby acquired prior jurisdiction of the subject matter, and (2) relator thereby acquired the right to continue its proceedings to a conclusion, unimpaired by any effort whatever upon the part of respondent to annex any of the same area.

 Therefore, we further hold that relator (Kansas City, Missouri) by its said effective amendment of its city charter to so extend its city limits northward into Clay County, Missouri, thereby acquired, effective as of January 1, 1950, and it now has exclusive municipal

jurisdiction in and over all of that portion of Clay County, Missouri set out and particularly described by metes and bounds in its said charter amendment as being the area in Clay County relator proposed to be annexed to its city limits, all as the same appears and is now described in Ordinance 10349, passed by the City Council of Kansas City, Missouri and approved by its mayor on September 3, 1946.

Therefore, we further hold that respondent (North Kansas City, Missouri) by its said Ordinance 1193 (passed by its Board of Aldermen on August 20, 1946, approved by its Mayor August 27, 1946, and approved by its electors on September 10, 1946) acquired no municipal jurisdiction whatever in, upon or over any of that portion of Clay County, Missouri, wherein and upon which relator (Kansas City, Missouri) did acquire exclusive municipal jurisdiction by virtue of its said charter amendment as set out in its said Ordinance 10349.

The writ of ouster as prayed by relator against respondent, in the information filed herein, is ordered issued and made permanent.

*Dalton, Tipton, Clark* and *Ellison, JJ.,* and *Hyde, C. J.,* concur.

*Leedy, J.,* concurs in separate opinion filed.

 LEEDY, J. (concurring).—I concur in all that is said in the principal opinion except as to the reasoning by which it is held that the provisions of § 16, Art. IX of the Constitution of 1875 (in effect when relator's charter was originally adopted), when coupled with the somewhat similar provisions of § 20, Art. VI of the 1945 Constitution, constitute ''foregoing provisions'' within the meaning of the first sentence of the section and article last mentioned,[1] which section authorizes amendments to city charters and outlines the procedure to submit and adopt the same. Such conclusion is based, in substantial measure, upon the finding and declaration that § 20, Art. VI of the Constitution of 1945 ''contains no reference to any certain section or to any certain Constitution.'' To this I cannot agree. A more direct reference to the immediately preceding section (§ 19) of that article of that very Constitution would be hard to imagine. § 19 is the first section dealing with municipal government under special charters. I do not think a jot or tittle would have been added to or detracted from the sense or meaning of the sentence in question had it read: ''Amendments of any city charter adopted under § 19 of this Constitution,'' etc. It will be noted that § 22, Art. VI, in express and direct terms, denies to the legislature the authority to create or fix the powers, duties or compensation of any municipal office or employment ''for any city framing or adopting

---

[1]''Amendments of any city charter adopted under the foregoing provisions may be submitted to the electors by a commission as provided for a complete charter.''

its own charter under this *or any previous Constitution*," etc. The framers of the 1945 Constitution found no difficulty in recognizing the fact of the existence of cities having special charters under previous Constitutions, and it does seem strange that they would not have used similarly plain and direct language in making provision for the amendment of such charters. In considering what are "foregoing provisions," it is to be borne in mind that under § 1 of the Schedule, the provisions of § 16, Art. IX of the 1875 Constitution were superseded by the 1945 Constitution.

I prefer to put my concurrence upon a construction of § 20, Art. VI, which would limit the submission of amendments by a commission as provided for a complete charter to those instances where the charter had been "adopted under the foregoing provisions," that is, charters adopted subsequently to the 1945 Constitution. The next sentence provides that "Amendments may also be proposed by the legislative body of the city," etc. It will be noted the language here used is not "the legislative body of *such* city."

I would not limit this reference to "the legislative body of the city" to those adopting special charters subsequent to the 1945 Constitution, as in the case provided in the first sentence of this section. I think it means that amendments may be proposed by the legislative body of any city having a special charter, whether the same was adopted under a previous Constitution or in conformity with the 1945 Constitution. This brings my views into harmony with the holding of the principal opinion that the 1945 Constitution did not intend to withdraw from municipalities the right to amend their charters which had been adopted before the effective date of the 1945 Constitution, and that the language of § 20, Art. VI (under the construction I have given it) makes this plain.